Keel, J., delivered the opinion of the Court in which Keller, P.J., and Keasler, Hervey, Richardson, Yeary, Newell, and Slaughter, JJ., joined.
A jury convicted Appellant of felony murder for causing the death of another while committing felony driving while intoxicated, *667 and it sentenced him to seventy-five years in prison. The court of appeals affirmed. We granted Appellant's petition for discretionary review to decide whether an accident reconstruction expert can testify about a specific type of accident reconstruction in which he has no formal training and whether accident reconstruction should be governed by the Kelly or Nenno test for evaluating the reliability of the expert testimony. Kelly v. State , 824 S.W.2d 568 (Tex. Crim. App. 1992) ; Nenno v. State , 970 S.W.2d 549, 560 (Tex. Crim. App. 1998), overruled on other grounds by State v. Terrazas , 4 S.W.3d 720 (Tex. Crim. App. 1999). We affirm the judgment of the court of appeals.
I. Background
A. Relevant Facts
i. The Accident
Appellant left a bar shortly before 3:00 a.m. and drove his car eastbound on Nakoma Drive. The decedent, Gilbert Chavez, was riding his motorcycle in the westbound lane of Nakoma Drive. As both Appellant and Chavez approached the intersection of Nakoma Drive and Colwick Street from opposite directions, the vehicles collided. Mario Negron and Kenneth Ferrer testified that they were driving in the westbound lane of Nakoma Drive around 3:00 a.m. when they came upon the accident. Both testified to driving through the debris of the accident.
Negron and Ferrer saw Chavez was badly injured and lying near his motorcycle, and they called for help. They saw Appellant at the scene stumbling near his car which had crashed into a building. When police officers arrived, Appellant told them that Chavez had driven into his lane of traffic; he later told one of the officers that Chavez had pulled out in front of him as if Chavez had been traveling in the same direction as Appellant and had hit Appellant on the right side.
Chavez was taken to the hospital where he later died from his injuries. Dr. Randy Frost, the Bexar County Chief Medical Examiner, testified the injuries were consistent with an automobile accident, and multiple traumatic blunt force injuries were the cause of death.
ii. Detective Doyle's Testimony
Detective John Doyle was assigned to the San Antonio Police Department's Traffic Investigation Detail. In his twenty-three years as a police officer, he had investigated at least a thousand vehicular crashes and had testified once as an accident reconstruction expert in a case that involved two cars and a pickup truck. To qualify for his position in SAPD's Traffic Investigation Detail, Doyle attended three courses related to vehicle collisions. Doyle learned the basics of crash investigation - including "skid to stop" formulas, diagram drawing and scene measurement - in an intermediate crash investigation course. He later attended an advanced course at Texas A & M University where he learned how to conduct an "energy analysis" to calculate speed. Doyle also took a reconstruction course and courses on accidents involving pedestrians and bicycles. He testified that his accident reconstruction course work totaled 501 hours.
Doyle never took a course specifically related to motorcycle accident reconstruction and testified that he did not know of one offered in Texas. He admitted that there are "different physics, different science, [and] different mathematical principles" when evaluating a crash that involves two cars versus a crash that involves a car and a motorcycle. He testified, however, that the differences typically have to do with speed calculations and that the "basic facts" of an accident are still the same.
*668 At the accident scene, Doyle observed Appellant's car crashed into a building and Chavez's motorcycle lying in the adjacent parking lot. Doyle did a visual inspection of the debris, tire marks and vehicular damage. He then used a precision surveying tool, a Sokkia instrument, to map the locations of the vehicles, debris, curb strikes and scrapes, and the dimensions and curvature of the road. Using these measurements, Doyle created a diagram of the accident that showed the spacial relationship between all of the pieces of evidence at the scene of the accident. Doyle could not calculate the speed of the vehicles at the time of the collision due to the huge weight differential between the car and the motorcycle and due to Appellant's car having crashed into a building without displacing it.
Detective Doyle observed a debris field in the westbound lane of Nakoma Drive that included pieces of Chavez's motorcycle. The debris was in front of the area of impact because the momentum of the debris carried it in the direction in which the motorcycle was traveling at the time of impact. There was no debris in Appellant's lane. There was no pre-impact braking by either the motorcycle or the car. There were three curb strikes and two scrape marks between the resting place of the motorcycle and the resting place of the car. Appellant's car sustained damage on its front left corner because the motorcycle struck the car's wheel well. Part of Appellant's front bumper was lodged in the cooling fins on the left side of Chavez's motorcycle.
On impact the motorcycle and Chavez "took two different paths" with the motorcycle pushed up and backwards while Chavez went over and beside the car, flinging bodily tissue onto it from the gaping wound in his leg and leaving a trail of hand prints in the dust on the car.
Doyle formed the opinion that the wreck was "more or less" a head-on collision:
Basically that the vehicle driven by the defendant straightened out the cur[ve], hit the motorcycle in the - his traffic lane, in the oncoming traffic lane. The motorcyclist was struck by the left front corner of the car. He went over the car and the vehicle was - motorcycle was pushed backwards into the parking lot. The vehicle continued on in its same direction resulting in ultimately the death of the complainant.
Appellant's failure to negotiate the curve was consistent with alcohol impairment. Doyle testified, "That's one of the very, very common factors in alcohol-related crashes is failing to negotiate a curve, basically straightening out a curve, very common." He concluded that Appellant caused the crash due to alcohol intoxication. He dismissed Appellant's alternative, on-scene claims that Chavez came up from behind him and hit him on his right or crossed into Appellant's lane; Doyle found those scenarios to be inconsistent with the physical evidence that he observed.
B. Issues Presented
This Court granted review to resolve three issues raised by Appellant. First, did the court of appeals violate Texas Rule of Evidence 702 in affirming the trial court's decision to admit Doyle's expert testimony though he had no qualifications in motorcycle accident reconstruction? Second, in relying on Nenno instead of Kelly , did the court of appeals apply the wrong standard when deciding that Doyle's testimony was reliable even though he applied no scientific theory or testing from the field of accident reconstruction and had no qualifications in the field of motorcycle accident reconstruction? Third, should the Nenno standard apply when an expert in a technical scientific field chooses not to apply the *669 scientific testing or theory to a particular case? We reject the premises that Doyle had no qualifications and chose to apply no scientific theory or testing. We hold that the trial court did not abuse its discretion in admitting Doyle's expert testimony; the Nenno standard was applicable under the circumstances of this case; and Doyle's testimony was reliable. Consequently, we affirm the judgment of the court of appeals.
C. Standard of Review
An appellate court reviews a trial court's ruling on the admission of evidence for an abuse of discretion. Rodgers v. State , 205 S.W.3d 525, 527 (Tex. Crim. App. 2006) ; Powell v. State , 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). The trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. Montgomery v. State , 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).
II. Analysis
A. Expert Witness Testimony
An expert witness may offer an opinion if he is qualified to do so by his knowledge, skill, experience, training or education and if scientific, technical or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. TEX. R. EVID. 702. Witnesses who are not experts may testify about their opinions or inferences when those opinions or inferences are rationally based on the perception of the witnesses and helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue. TEX. R. EVID. 701. There is no distinct line between lay opinion and expert opinion. Osbourn v. State , 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).
Three requirements must be met before expert testimony can be admitted: "(1) The witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case." Vela v. State , 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. The first two are in play with respect to Detective Doyle's testimony.
B. Qualification
The specialized knowledge that qualifies a witness to offer an expert opinion may be derived from specialized education, practical experience, a study of technical works or a combination of these things. Wyatt v. State , 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). "A witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background 'goes to the very matter on which [the witness] is to give an opinion.' " Vela v. State , 209 S.W.3d 128, 131 (Tex. Crim. App. 2006), quoting Broders v. Heise , 924 S.W.2d 148, 153 (Tex. 1996). "Fit" is a component of qualification, and "the expert's background must be tailored to the specific area of expertise in which the expert desires to testify." Vela , 209 S.W.3d at 133. The party offering expert testimony has the burden to show the witness is qualified on the matter in question. Penry v. State , 903 S.W.2d 715, 762 (Tex. Crim. App. 1995).
To determine whether a trial court has abused its discretion in ruling on an expert's qualifications, an appellate court may consider three questions: (1) Is the field of expertise complex? (2) How conclusive is the expert's opinion? (3) How central is the area of expertise to the *670 resolution of the lawsuit? See Rodgers , 205 S.W.3d at 528. Greater qualifications are required for more complex fields of expertise and for more conclusive and dispositive opinions. Id. The first two Rodgers ' factors - complexity and conclusiveness - weigh in favor of less stringent qualification requirements in this case while the third factor - dispositiveness - weighs in favor of higher requirements.
Accident reconstruction may sometimes be complex, but the reconstruction opinion offered by Doyle was not. He did not calculate pre-impact vehicle speeds; he examined the physical evidence in the context of the accident scene to form an opinion about the area of impact and how the collision occurred. His testimony was more akin to latent print comparison than to DNA profiling because it was relatively simple. See ids="8448840" index="15" url="https://cite.case.law/sw3d/205/525/#p527">id. Nor was his testimony very conclusive; he testified that the area of impact was an estimation, not a precise point. According to Doyle, the phrase "point of impact" has fallen out of favor because "it's never a precise point, and it's an area of impact." His opinion was dispositive because there was no other evidence about the central issues of location and cause of the accident. Given that two of the three Rodgers factors weigh in favor of upholding the trial court's ruling on Doyle's qualifications, we cannot say the trial court abused its discretion in admitting Doyle's opinions.
Although Doyle had never taken a class that focused on motorcycle-involved crashes, he knew how to analyze an accident scene based on debris, vehicle damage, skid and gouge marks and vehicle resting places, and he had done so hundreds of times. The involvement of a motorcycle in this collision did not interfere with his ability to analyze the physical evidence present at the accident scene, and his background went to the very matter about which he testified.
Appellant argues that Doyle was not qualified to testify as an expert in motorcycle accident reconstruction because he was not trained to conduct speed and energy calculations for accidents involving motorcycles. But Doyle offered no opinions involving such calculations. According to Doyle, such calculations were impossible because of the weight differential between the car and motorcycle and because the car hit a building that was not displaced. His failure to conduct an impossible speed analysis did not make him unqualified to testify about where and how the crash occurred based on an analysis of the physical evidence at the crash site.
Appellant contends that the use of the Sokkia measuring device and the diagraming of the scene were not scientific methods and that Doyle did not apply any scientific theory in this case. We disagree that measuring and diagraming are not scientific methods. But even if they were not were not scientific methods, that would not mean that Doyle was unqualified; an expert does not need to use scientific methods to be qualified. Morris v. State , 361 S.W.3d 649, 654 (Tex. Crim. App. 2011). An expert is qualified by specialized knowledge, training, or experience. Wyatt , 23 S.W.3d at 27. There is no requirement that the expert's specialized knowledge, training or experience be based on scientific principles.
The trial court is supposed to act as a gatekeeper against expert testimony that would not help the trier of fact. This is not the same thing as requiring every expert to be the best possible witness. We agree with the State that the relevant question was not whether Doyle lacked a particular qualification that would have made him the ideal expert witness but whether the qualifications that he did have *671 would have assisted the jury in determining an issue of fact. We hold that Doyle's qualifications would have assisted the jury in determining issues of fact, namely, where and how the collision happened, and we affirm the court of appeals' decision that the trial court did not abuse its discretion in determining Doyle was qualified to offer an expert opinion on these issues.
C. Reliability
The next issues are whether the expert testimony about accident reconstruction in this case should be evaluated for reliability under Kelly or Nenno and whether Doyle's testimony was reliable.
When an expert's testimony is based on a hard science involving precise calculations and the scientific method, the expert must satisfy the test set forth in Kelly , 824 S.W.2d at 573. Morris , 361 S.W.3d at 654. ("When the subject of an expert's testimony is 'scientific knowledge,' then the basis of that testimony must be grounded in the accepted methods and procedures of science."). The Kelly test for reliability of evidence derived from a scientific theory requires that: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. Kelly , 824 S.W.2d at 573.
Nenno set forth a framework for evaluating the reliability of expert testimony in fields of study outside the hard sciences. Nenno , 970 S.W.2d at 561. The Nenno test asks whether (1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies upon and/or utilizes the principles involved in the field. Id. The distinctions between hard and soft sciences may be blurred, and the reliability inquiry is flexible. Id. at 560-61.
Appellant argues that this case should be analyzed under Kelly because accident reconstruction is a hard science. He also claims that Doyle's testimony would fail the Kelly test and even the less stringent Nenno test because Doyle did not use the scientific methods and principles that were available to him when he failed to calculate the speed of the vehicles before the collision. We disagree. While a speed calculation might fall under the Kelly test, Doyle could not do a speed calculation in this case due to the weight differential between the car and the motorcycle and because the car crashed into a building without displacing it. Under these circumstances, Doyle's failure to conduct a speed calculation was irrelevant to the reliability of his opinions about how and where the collision happened based on the physical evidence he observed at the scene. As the State points out, Doyle used physical evidence to put together a fairly simple jigsaw puzzle.
Judge Walker's concurring opinion cites Wooten v. State , 267 S.W.3d 289 (Tex. App.-Houston [14th Dist.] 2008, pet. ref'd), and Pena v. State , 155 S.W.3d 238 (Tex. App.-El Paso 2004, no pet.), as support for applying the Kelly test here. But those cases are distinguishable from this one because they addressed the admissibility of expert testimony about the pre-impact speed of the defendants' vehicles. Wooten , 267 S.W.3d at 304 ; Pena , 155 S.W.3d at 246.
We agree with the court of appeals that the Nenno test applied to Doyle's testimony because his opinions were based on his training and experience in evaluating physical evidence at crash scenes more than on a hard scientific inquiry such as calculating a vehicle's pre-impact speed. Rhomer v. State , 522 S.W.3d 13, 17 (Tex. App. - San Antonio 2017). We *672 conclude that (1) the field of accident reconstruction is a legitimate one, (2) the subject matter of Doyle's expert testimony was within the scope of that field, and (3) his testimony properly relied upon and utilized the principles involved in the field, i.e., examining the physical evidence in the context of the crash site to draw conclusions about the location and cause of the crash.[1]
III. Conclusion
Doyle was qualified to testify as an expert in accident reconstruction, and his testimony was reliable. We affirm the judgment of the court of appeals.
Hervey, J., filed a concurring opinion in which Keasler, Richardson, and Newell, JJ., joined.
Walker, J., filed a concurring opinion.
CONCURRING OPINION
Hervey, J., filed a concurring opinion in which Keasler, Richardson, and Newell, JJ., joined.
Although the issues granted all involve the admission of testimonial evidence, we must stress that our review of the trial court's action is based on an abuse of discretion standard.
Next, by virtue of our own caselaw,
It is only at the dawn of judicial consideration of a particular type of forensic scientific evidence that trial courts must conduct full-blown "gatekeeping" hearings under Kelly . Once a scientific principle is generally accepted in the pertinent professional community and has been accepted in a sufficient number of trial courts through adversarial Daubert / Kelly hearings, subsequent courts may take judicial notice of the scientific validity (or invalidity) of that scientific theory based upon the process, materials, and evidence produced in those prior hearings.
Hernandez v. State , 116 S.W.3d 26, 29 (Tex. Crim. App. 2003).
Thus, before one proffers testimonial evidence to be that of an expert, it should be understood that the process should occur at trial. And then a careful and strategic navigation of statutory mandates, caselaw, and rules of evidence, should be undertaken through the oftentimes difficult, but crucial world of ever-changing forensic science.
I write separately to note some matters to be considered in this arena. We start with the rule that "a forensic analysis of physical evidence ... and expert testimony relating to the evidence [is] not admissible in a criminal action" if the crime laboratory where the analysis was performed was not accredited under Article 38.01. TEX. CODE CRIM. PROC. art. 38.35(d)(1).
The Texas Forensic Science Commission, Crime Laboratory Accreditation and the Admissibility of Scientific Evidence
The Texas Forensic Science Commission (the Commission) is responsible for accrediting *673 crime laboratories.[1] Id. art. 38.01 § 4-d(b)(1) ("The commission by rule: ... shall establish an accreditation process for crime laboratories and other entities conducting forensic analyses of physical evidence for in criminal proceedings ...."). Although the word "accredited" is not defined in Texas law, Black's Law Dictionary defines it as "[h]aving official approval to do something, esp[ecially] by reason of having reached an acceptable standard." Thus, the Commission is responsible for ensuring that all crime laboratories meet minimum acceptable standards,[2] or evidence of forensic analyses performed at the laboratory are generally inadmissible. Id. at § 38.35(d)(1).
To assist the Commission with its accreditation mandate, the legislature delegated rule-making authority to it to "validate or approve specific forensic methods or methodologies ...." Id. art. 38.01 § 4-d(b-1). This means that, whether a crime laboratory must be accredited depends on the forensic discipline drawn on. For example, if a crime laboratory was accredited by the Commission for toxicology, but not for firearms/toolmarks, evidence of a forensic analysis of firearms/toolmarks performed at that laboratory is inadmissible, but evidence of a forensic analysis involving toxicology performed at the laboratory is admissible. Thus, by choosing which scientific disciplines require accreditation, and because crime laboratories must be accredited, the Commission largely controls the admissibility of forensic evidence in a criminal action.[3] Id. art. 38.35(d)(1).
So what types of forensic disciplines require a laboratory to be accredited? The Commission has determined that crime laboratories must be accredited in the following scientific disciplines:
(a) Forensic analysis/recognized accreditation. This section describes a discipline or category of analysis that involves forensic analysis for use in a criminal proceeding and for which accreditation is available from a recognized accrediting body.
(b) By discipline or category of analysis. A crime laboratory may apply for Commission accreditation for one or more of the following disciplines:
(1) Seized Drugs. Categories of analysis may include one or more of the following categories: qualitative determination, quantitative measurement, weight measurement, and volume measurement;
(2) Toxicology. Categories of analysis may include one or more of the following categories: qualitative determination and quantitative measurement;
(3) Forensic Biology. Categories of analysis may include one or more of the following categories: collection, *674 DNA-STR, DNA-YSTR, DNA-Mitochondrial, DNA-SNP, body fluid identification, relationship testing, microbiology, individual characteristic database, and nucleic acids other than human DNA;
(4) Firearms/Toolmarks. Categories of analysis may include one or more of the following categories: physical comparison, determination of functionality, length measurement, serial number restoration, trigger pull force measurement, qualitative chemical determination, distance determination, ejection pattern determination, product (make/model) determination, and individual characteristic database;
(5) Document Examination. Categories of analysis may include one or more of the following categories: document authentication, physical comparison, and product determination;
(6) Materials (Trace). Categories of analysis may include one or more of the following categories: physical determination, chemical determination, physical/chemical comparison, product (make/model) determination, gunshot residue (collection and qualitative determination), footwear and tire tread (collection, enhancement, physical comparison and product (make/model) determination), and fire debris and explosives (qualitative determination); or
(7) Other discipline and its related categories of analysis if accredited by a recognized accrediting body and approved by the Commission.
37 TEX. ADMIN. CODE § 651.5(b) (Tex. Forensic Sci. Comm'n, Forensic Disciplines and Procedures Subject to Commission Accreditation).
On the other hand, the Commission presently has exempted a number of disciplines from the accreditation requirement, meaning that the laboratory where the forensic analysis was performed need not be accredited for evidence of that analysis to be admissible in a criminal action,
(1) sexual assault examination of a person;
(2) forensic anthropology, entomology, or botany;
(3) environmental testing;
(4) facial or traffic accident reconstruction [the subject of this case ];
(5) serial number restoration;
(6) polygraph examination;
(7) voice stress, voiceprint, or similar voice analysis;
(8) statement analysis;
(9) forensic odontology for purposes of human identification or age assessment, not to include bite mark comparison related to patterned injuries;
(10) testing and/or screening conducted for sexually transmitted diseases ; or
(11) fire scene investigation, including but not limited to cause and origin determinations.
Id. § 651.7(a) (Tex. Forensic Sci. Cmm'n, Forensic Disciplines and Procedures Exempt from Accreditation Requirements by Administrative Rule). Further, certain types of analyses are excluded from the definition of "forensic analysis," so the analysis is not covered by the accreditation requirement. Examples of excluded analyses include (1) latent fingerprint examinations, (2) tests of breath specimens obtained through implied consent, (3) analyses of digital evidence, (4) examinations or tests excluded by rule under Article 38.01, (5) a presumptive blood test to determine compliance with probation and parole restrictions, and (6) "an expert examination or test conducted principally for the purpose of scientific research, medical practice, civil or administrative litigation, or other purpose unrelated to determining *675 the connection of physical evidence to a criminal action." Id.
Based on the foregoing, the first question a practitioner should ask when dealing with forensic science evidence is whether the laboratory where the analysis was performed was properly accredited.[4] If not, evidence of that analysis is likely inadmissible. Id.
Forensic Analyst Licensing
Effective January 1, 2019, "[a] person may not act or offer to act as a forensic analyst unless the person holds a forensic analyst license." Act of May 31, 2015, 84th Leg., R.S., ch. 1276, §§ 4, 17(b), art. 38.01, 2015 Tex. Gen. Law 4315, 4317-18 (codified at TEX. CODE CRIM. PROC. art 38.01 § 4 -a(b) ). A "forensic analyst" means "a person who on behalf of a crime laboratory accredited under this article technically reviews or performs a forensic analysis or draws conclusions from or interprets a forensic analysis for a court or crime laboratory," but the term "does not include a medical examiner or other forensic pathologist who is a licensed physician." TEX. CODE CRIM. PROC. art. 38.01 § 4 -a(2). This will provide another avenue for parties to litigate in court: whether the analyst who performed the forensic analysis was licensed.
Preemption of the Rules of Evidence?
Articles 38.01 and 38.35 also have another effect. Rule 702 of the Texas Rules of Evidence states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. This rule of evidence has been a stalwart and guiding light for the admittance of expert testimony in a criminal action.
*676 However, by virtue of its rule-making authority authorized by statute, the TFSC might be able to abrogate Rule 702. For example, if a laboratory technician performs a toxicology analysis at a unaccredited laboratory, expert testimony about that analysis is likely inadmissible regardless of the qualifications of the analyst and the accuracy of the analysis. The issue should not be litigated, and the trial judge should not determine "whether a witness is qualified ... or evidence is admissible" under those circumstances, notwithstanding whether Rule 702 seems to have been satisfied and the testimony might have assisted the trier of fact. Id. R. 104(a), 702 ; see TEX. CODE CRIM. PROC. arts. 38.01 and 38.35. Finally, the evidence should be categorized pursuant to Kelly / Nenno so that either of those tests/standards can be met.[5]
CONCLUSION
How these questions will be resolved remains to be seen, but I believe that the issues are important, and the bench and bar should be aware of them. It is for these reasons that I write separately. With these comments, I join the opinion of the majority.
CONCURRING OPINION
Walker, J., filed a concurring opinion.
Appellant, William Rhomer, was convicted of felony murder stemming from an automobile-motorcycle collision, with the predicate felony being felony driving while intoxicated. At trial, over Appellant's objection, a police detective testified and provided an opinion on how and precisely where the collision occurred. The court of appeals found that the admission of this testimony was not an abuse of discretion and upheld Appellant's conviction. Under the circumstances, the trial court did not abuse its discretion, and I agree with the Court's conclusion today that the court of appeals correctly upheld the trial court's ruling. However, the court of appeals reached that conclusion through an erroneous review, and the majority compounds this error by upholding it. To the extent the Court's decision upholds the trial court's ruling, I concur. I disagree with the Court's opinion holding that the court of appeals correctly evaluated the reliability of Doyle's opinion under the Nenno standard instead of the Kelly standard. Actual accident reconstruction is a hard science, and the reliability of actual accident reconstruction opinions should be judged under *677 Kelly . I respectfully decline to join the majority opinion. I will note that I agree that an accident reconstructionist may, in some situations, testify to an expert opinion that is not actual accident reconstruction. Such opinions may be analyzed under the Nenno standard. However, Detective Doyle's opinion in this case as to who caused the accident is not such an opinion.
I - Standard of Review
A trial court's ruling in the admission or exclusion of evidence is reviewed for an abuse of discretion. Beham v. State , 559 S.W.3d 474, 478 (Tex. Crim. App. 2018) ; Martinez v. State , 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court's decision will be upheld if it is reasonably supported by the record and correct under any theory of law applicable to the case. Willover v. State , 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). An abuse of discretion in admitting evidence occurs when the decision is so clearly wrong as to lie outside the zone within which reasonable persons might disagree. McDonald v. State , 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). In other words, abuse occurs only if the reviewing appellate court can say, with confidence, that no reasonable perception of the matter under consideration could have yielded the decision made by the trial court. See Montgomery v. State , 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). This consideration is made in light of what was before the trial court at the time the ruling was made. Billodeau v. State , 277 S.W.3d 34, 39 (Tex. Crim. App. 2009) ; Martin v. State , 173 S.W.3d 463, 467 (Tex. Crim. App. 2005).
II - Information Before the Trial Court
Here, the trial court's decision was not an abuse of discretion because the information before the trial court, at the time of the ruling admitting Detective Doyle's opinion testimony, was insufficient to apprise the trial court that Detective Doyle's opinion should have been excluded as inadmissible. Trial counsel failed to ask Doyle the right questions, and trial counsel failed to make the right arguments to show the trial court that Doyle's opinion as to the location of the accident was unreliable.
For example, trial counsel failed to question Doyle about the basis for his opinion that the location of the debris was the location of the area of impact. Perhaps counsel may have thought Doyle was correct, because counsel did not consider the possibility that the debris, much like the motorcycle itself, could have changed direction as a result of the collision with Appellant's automobile. Counsel may also have neglected to consider the possibility that the debris could have been carried by the automobile before falling onto the roadway. During the voir dire examination, counsel did not question Doyle about other possible theories of how the collision occurred, such as if the motorcycle turned into Appellant's lane and how the damage to the vehicles could have been consistent with that theory. Furthermore, counsel did not ask Doyle if Appellant could have made a sharp left turn to try and avoid the collision. Counsel also did not ask Doyle if the collision with a motorcycle would have caused Appellant's vehicle to veer to the left due to the impact, unlike a collision with a pedestrian or a collision with a bicycle. Counsel did not ask Doyle if the damage to Appellant's automobile would have also contributed to any veer to the left.
Also, assuming the scaled diagram created by Doyle was accurate,[1] and assuming Appellant, as asserted by Detective Doyle, *678 simply continued straight from his starting position and failed to make the turn, then Appellant's vehicle would have crossed into the westbound lane at a point farther to the east than the indicated location of the debris. Counsel nevertheless failed to question Doyle about this. In addition, if Appellant truly did fail to make the gradual curve in the road and drifted into the westbound lane, counsel should have asked Doyle if the motorcycle would have had plenty of time to swerve out of the way of Appellant's vehicle in order to avoid the collision.
Finally, trial counsel did not have an accident reconstruction expert witness of his own to question the reliability of Doyle's opinion.
Plainly stated, counsel did not give the trial court any reason to believe Doyle's opinion was incorrect or unreliable. Counsel did not subject Doyle's opinion to sufficient scrutiny. Had counsel done so, the trial court, in all likelihood, would not have allowed Doyle to provide his opinion as to the cause of the collision. Because the trial court's ruling was not an abuse of discretion, I agree with the Court's decision today to affirm the court of appeals's judgment upholding the trial court's ruling. Nevertheless, I disagree with the analysis by the court of appeals and by this Court affirming the court of appeals.
III - Reliability: Kelly or Nenno
The court of appeals erred in evaluating the reliability of Detective Doyle's opinion under Nenno because actual accident reconstruction is not like a Nenno "soft" science, but is rather closer to the "hard" sciences which are subject to Kelly . In Kelly , we laid out the standard for determining whether an expert's scientific opinion was reliable: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question. Kelly v. State , 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). In Nenno , we laid out a looser standard for opinions about "soft" sciences such as psychology. See Nenno v. State , 970 S.W.2d 549, 561 (Tex. Crim. App. 1998). We explained the difference between "hard" sciences and "soft" sciences in Weatherred v. State :
The "hard" sciences, areas in which precise measurement, calculation, and prediction are generally possible, include mathematics, physical science, earth science, and life science. The "soft" sciences, in contrast, are generally thought to include such fields as psychology, economics, political science, anthropology, and sociology.
Weatherred v. State , 15 S.W.3d 540, 542 n.5 (Tex. Crim. App. 2000). To gauge the reliability of an expert opinion in a "soft" science under Nenno , "[t]he appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." Nenno , 970 S.W.2d at 561.
In this case, the court of appeals decided that Nenno analysis was appropriate because Detective Doyle's accident reconstruction was not based upon a scientific inquiry (because he declined to analyze speed) and was based upon his training and experience. Rhomer v. State , 522 S.W.3d 13, 22 (Tex. App.-San Antonio 2017, pet. granted). I believe carving science away in this manner was error. Even if Detective Doyle did not bother making any speed calculations, his opinion as to the cause of the crash and where the crash occurred are still, in my view, scientific inquiries.
Nenno is appropriate "[w]hen addressing fields of study aside from the hard *679 sciences, such as the social sciences or fields that are based primarily upon experience and training as opposed to the scientific method." Nenno , 970 S.W.2d at 561. In that situation, " Kelly 's requirement of reliability applies but with less rigor than to the hard sciences." Nenno , 970 S.W.2d at 561. Nenno 's application depends on whether the field is characterized as primarily based upon training and experience. The qualification of the witness (his or her training and experience) is irrelevant to question of whether Kelly or Nenno applies. Nevertheless, the court of appeals determined that Kelly analysis did not apply because Detective Doyle did not perform any scientific analysis and because he had training and experience. In other words, the court of appeals, finding Detective Doyle qualified as an expert, allowed his choice to avoid scientific analysis to dictate that accident reconstruction was not a scientific query and thus should be measured under Nenno .
The field of actual accident reconstruction appears to be based firmly in hard science, and the Kelly standard should be the one to evaluate the reliability of an accident reconstruction witness's opinion. It involves precise measurement, calculation, and prediction. See Weatherred , 15 S.W.3d at 542 n.5. Indeed, the purported reconstruction in this case included measurements in Detective Doyle's use of the Sokkia surveying device to map out the locations of objects at the accident site. Reconstruction also involves calculations and predictions. Detective Doyle acknowledged, on cross-examination, that car-to-car accident reconstruction and car-to-motorcycle accident reconstruction involved different physics, different science, and different mathematical principles.[2] The fact that the physics, science, and mathematical principles are different between the two types of cases necessarily means that there is some kind of physics, science, and mathematics involved in car-to-motorcycle accident reconstruction. Detective Doyle's own testimony would place actual accident reconstruction, whether car-to-car or car-to-motorcycle, as a hard science. See ids="11528487" index="53" url="https://cite.case.law/sw3d/15/540/">id. (hard sciences include mathematics and physical sciences). Yet the court of appeals and the majority of this Court conclude that motorcycle-accident reconstruction is a soft science like economics and psychology subject to the Nenno standard.
For comparison, our cases where we examined the expert opinion's reliability under Nenno involve fields such as:
• Weapon focus,[3]
• Grooming of children for sexual molestation,[4]
• Eyewitness identification,[5]
• Satanism,[6]
• Future dangerousness,[7] and
• "Filicide."[8]
In contrast, our cases examining the expert's testimony under Kelly involved testimony about:
*680 • Abusive head trauma,[9]
• DNA,[10]
• Gas Chromatograph Mass Spectrometer testing,[11]
• Enzyme-Multiplied Immunoassay Technique (EMIT) testing,[12]
• Retrograde extrapolation,[13]
• Medical testimony in sexual assault cases,[14]
• Protocol in operating Intoxilyzer breath test device,[15]
• Urine analysis for marijuana by an ADx device,[16]
• Toolmark examination,[17]
• Intoxilyzer,[18]
• Eyewitness identification (pre- Nenno ),[19]
• Horizontal gaze nystagmus (HGN) test,[20] and
• Fingerprint-comparison.[21]
In some cases, we did not consider the expert opinion evidence under a particular standard. In Roberts , the expert opinion involved the relationship between alcohol and drug abuse and violence. Roberts v. State , 220 S.W.3d 521, 527-31 (Tex. Crim. App. 2007). We found that we did not need to classify the evidence under either the "hard" or "soft" science headings. Id. at 530. In Coble , we examined the reliability of the offered expert opinion on future dangerousness under both Daubert/ Kelly and Nenno . Coble v. State , 330 S.W.3d 253, 272-279 (Tex. Crim. App. 2010).
Finally, unlike the Fourth Court of Appeals, other courts of appeals have looked at accident reconstruction as a "hard" science subject to Kelly analysis. See Pena v. State , 155 S.W.3d 238, 246 (Tex. App.-El Paso 2004, no pet.) ; Wooten v. State , 267 S.W.3d 289, 303-04 (Tex. App.-Houston [14th Dist.] 2008, pet. ref'd). Instead of upholding the Fourth Court of Appeals's decision that Nenno applies, I think the Eighth Court of Appeals and the Fourteenth Court of Appeals had the correct conclusion that Kelly applies.
IV - Reliability Under Nenno
Assuming, for the sake of argument, that it was proper to employ the Nenno *681 standard, I believe the court of appeals misapplied the standard. The court of appeals found Doyle's opinion reliable, under Nenno , because he reached his opinion based on his experience and specialized training. That is not the standard under Nenno . Under Nenno , "[t]he appropriate questions are: (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." Nenno , 970 S.W.2d at 561.
Assuming Nenno applies, the first two questions are easily resolved. There is no argument that accident reconstruction is not a legitimate field of expertise, and clearly Detective Doyle's testimony regarding how the accident occurred and where the area of impact was located is within the scope of accident reconstruction. Thus, the matter falls under the third Nenno question: whether Detective Doyle's testimony properly relied upon and/or utilized the principles involved in the field.
"Under either Daubert / Kelly or Nenno , reliability should be evaluated by reference to the standards applicable to the particular professional field in question." Coble , 330 S.W.3d at 274. "The objective of the 'gatekeeping' requirement is to make certain that an expert employs the same professional standards of intellectual rigor in the courtroom as is expected in the practice of the relevant field." Id. at 276. "The validity of the expert's conclusions depends upon the soundness of the methodology." Id. at 276-77.
Thus, if Detective Doyle is going to offer an opinion as an expert on accident reconstruction involving a motorcycle and an automobile, he needs to be held to the standards of intellectual rigor as is expected in the practice of the field.
What did Detective Doyle do as part of his investigation and reconstruction?
He walked around the scene, measured distances between objects using the Sokkia device, and generated a map displaying the Sokkia data. He explained that neither the Sokkia device nor the generated map analyze the data to reconstruct a crash scene, which is where the human element-the accident reconstructionist-would be involved.
Detective Doyle, in voir dire, stated that he did not apply any kind of scientific theory to the case.[22] However, shortly thereafter in response to a similar question, he said:
A. I can tell you that the motorcycle was pushed backwards by the car based on its mass. That's some scientific theory. Beyond that, that's pretty much it.[23]
Accepting, for the sake of argument, that Detective Doyle was qualified as an accident reconstructionist for motorcycle collisions, his testimony did not properly rely upon the principles of the field. His opinion could be rephrased as: "I saw debris at this location, I saw some curb strikes, and based upon my training and experience, the impact must have occurred where the debris was."
I believe Detective Doyle's opinion-that the motorcycle collision occurred where the debris was located because that was where the debris was located-was not reliable as an expert opinion and the court of appeals erred by determining that it was. However, as previously mentioned, trial counsel's cross-examination of Detective Doyle in voir dire examination was so *682 deficient that the trial court was not made aware that Detective Doyle's opinion was not reliable, which leads to my conclusion that the trial court's ruling was not an abuse of discretion.
V - Is Detective Doyle's Opinion Correct?
Finally, I have concerns that Detective Doyle's opinion-that the crash occurred because Appellant continued straight through the turn on Nakoma, left his eastbound lane, crossed into the westbound lane, and struck the motorcycle in the westbound lane-could potentially be incorrect as a matter of fact.
After reviewing the testimony, the photographs, and the diagram created by Detective Doyle,[24] I believe that it is just as likely that Appellant did not leave his lane, and instead it was the motorcycle which was out of position and was struck in the eastbound lane of Nakoma.
I agree with Detective Doyle that Appellant's car, upon striking the motorcycle, lifted the motorcycle up instead of pushing it down. As Doyle testified, if Appellant's car pushed the motorcycle down, there would have been a visible gouge mark in the road. The motorcycle at that point lifted up off the road, reversed direction, and was pushed backward into the parking lot where it landed and slid along the pavement of the parking lot.
Detective Doyle's opinion is that the location of the debris is necessarily in the lane where the impact occurred. However, I believe that such an assumption would almost certainly be incorrect. I believe that the debris created by the collision was also in motion after the crash. At the moment the motorcycle lifted up, reversed direction, and was thrown into the parking lot, the debris itself was likely lifted up, reversed direction, and thrown some distance in the same general direction that the motorcycle was thrown. As noted in the Court's opinion, Detective Doyle testified that he believed that the debris from the motorcycle was found in front of the area of impact because he believed the momentum of the debris carried it in the direction in which the motorcycle was traveling at the time of impact. I question how Detective Doyle could come to the conclusion that the debris continued going westbound, when the collision caused the motorcycle itself and the decedent to reverse direction and go eastbound into the parking lot. Certainly, the debris has less mass than either the motorcycle or the decedent, and, making the reasonable assumption that the motorcycle, the debris which was part of the motorcycle, and the decedent who was riding the motorcycle were all traveling at the same westbound velocity prior to the collision, the motorcycle and the decedent would have each had a much greater westbound momentum than the debris. Detective Doyle did not explain why the westbound momentum of the debris was so different from the westbound momentum of the motorcycle or the decedent that it was not overcome by the collision with Appellant's vehicle. I believe Appellant's vehicle could have carried the debris a considerable distance in the eastbound direction before the debris fell to the ground. My guess is that the debris was carried several yards from the point of impact in the same direction the motorcycle was thrown before it came to rest on the pavement, placing the area of impact in Appellant's lane. But I will admit that this is an educated guess at best, just as Detective Doyle's conclusion as to the area of impact was an educated guess at best. Neither Detective Doyle nor I used any accepted mathematical calculations or scientific *683 principles to determine how the difference in weight of the two vehicles, the speed of the motorcycle, the speed of the automobile, the mass of the motorcycle, the mass of the automobile, or the angle of the impact could have affected the result. I suspect there are several other factors that could affect how far the different items of debris traveled after the impact. Detective Doyle admitted that he did not use any mathematical calculations to determine the point of impact. He admitted that he did not perform any speed calculations of either vehicle. He did not have any training in motorcycle/automobile accident reconstruction that would allow him to determine how the big difference in weight and mass of the two vehicles would affect a determination of a precise area of impact. He admitted that his opinion as to the area of impact was primarily based on the location of the debris. He did not even mention the possibility that the debris may have been pushed by the car after the impact before the debris fell to the pavement. Doyle stated that his opinion was based on his training and experience. However, he had no training in motorcycle/automobile accident reconstruction, and he certainly did not have any training that would allow him to come to the conjectural conclusion that the debris landed on the pavement at the exact location of the area of impact.
There is no doubt in my mind that an accurate determination as to the precise area of impact in this case could not be made by any person who did not have specialized training in motorcycle/automobile accident reconstruction, which would include all the factors that can have an effect on debris traveling after a collision and what kinds of mathematical calculations would be necessary to determine an accurate area of impact. Detective Doyle's conclusion was not based on any science, let alone accepted science in the field of motorcycle/automobile accident reconstruction. His conclusions were certainly unreliable and, in my opinion, very likely factually incorrect. Without any analysis or scientific calculations from Detective Doyle indicating otherwise, it may be just as possible that the driver of the motorcycle was turning onto the side street and was actually struck in Appellant's lane. Again, trial counsel's cross-examination of Detective Doyle in voir dire examination was so deficient that the trial court was not made aware that the debris was likely carried a significant distance before falling to the pavement, which leads to my conclusion that the trial court's ruling was not an abuse of discretion.
VI - Conclusion
In conclusion, the court of appeals, in upholding the trial court's ruling admitting the testimony by Detective Doyle employed erroneous analysis by employing Nenno analysis instead of Kelly analysis. The majority today allows the court of appeals's error to stand, and for that reason I respectfully decline to join the majority opinion and its conclusion that actual accident reconstruction is a "soft science" subject to Nenno evaluation instead of as a "hard science" subject to Kelly evaluation. However, the trial court did not abuse its discretion in admitting the evidence, because counsel failed to effectively elicit and argue why Doyle's opinion was unreliable. Because the trial court did not abuse its discretion under these circumstances, I concur in the result.
APPENDIX A *684 --------

We do not endorse the lower court's holding that Doyle's testimony was reliable "based on his experience and specialized training." Rhomer , 522 S.W.3d 13 at 21. Qualification is evaluated by looking at the expert's training and experience. Reliability is evaluated by looking at the method the expert used to come to his conclusions. Doyle's testimony was reliable because it was based on the information he gathered at the scene: the measurements he took, the pictures he captured, the damage he observed, and the diagram he created. He was able to compile and synthesize all of that information thanks to his experience and training, but it was not his experience and training alone that made his testimony reliable.

A "crime laboratory" is any "public or private laboratory or other entity that conducts a forensic analysis subject to this article." Id. art. 38.35(a)(1) (emphasis added).

For example, Texas Department of Public Safety criminal laboratories are accredited by "the ANSI-ASQ National Accreditation Board (ANAB) to the ISO/IEC 17025 Standard and Supplemental Requirements required by the accrediting body." Tex. Dep't Pub. Safety, PEH-Manual -2019-0101-43044-5, at 4, available at https://www.dps.texas.gov/CrimeLaboratory/Pubs.htm. According to ANAB, "ISO/IEC 17025 specifies the general requirements for competence to carry out tests/ and or calibrations, including sampling." ANAB, About ANAB, available at https://www.anab.org/forensic-accreditation/iso-iec-17025-forensic-labs-process-0.

There are some statutory exceptions, which the Commission has no rule-making control over. For example, latent fingerprint examinations are not considered a forensic analysis as that term is defined in Article 38.35. Tex. Code Crim. Proc. art. 38.35(a)(4)(A).

Although a crime laboratory is not accredited to perform forensic analyses based on one of the identified forensic disciplines at the time of the analysis, evidence about that analysis is nonetheless admissible if the laboratory was eligible for accreditation at the time of the analysis or test, and the laboratory becomes accredited before evidence is given about the examination or test. Id. art. 38.35(e). On the other hand, the Commission can exempt certain crime laboratories from the accreditation requirement:
(c) The commission by rule may exempt from the accreditation process established under Subsection (b) a crime laboratory conducting a forensic analysis or a type of analysis, examination, or test if the commission determines that:
(1) independent accreditation is unavailable or inappropriate for the laboratory or the type of analysis, examination, or test performed by the laboratory;
(2) the type of analysis, examination, or test performed by the laboratory is admissible under a well-established rule of evidence or a statute other than Article 38.35 ;
(3) the type of analysis, examination, or test performed by the laboratory is routinely conducted outside of a crime laboratory by a person other than an employee of the crime laboratory; or
(4) the laboratory:
(A) is located outside this state or, if located in this state, is operated by a governmental entity other than the state or a political subdivision of the state; and
(B) was accredited at the time of the analysis under an accreditation process with standards that meet or exceed the relevant standards of the process established under Subsection (b).
Id. art. 38.01. Also, a forensic analysis of physical evidence and expert testimony related thereto is admissible-despite that fact that the laboratory is not accredited-if the laboratory was eligible for accreditation at the time of the analysis or test, and the laboratory becomes accredited before testimony is given about the examination or test. Id. art. 38.35(e).

The threshold issue for a trial court when dealing with the admission of expert testimony is whether the proponent has shown by clear and convincing proof that the testimony will assist the trier of fact to understand the evidence or determine a factual issue. Kelly v. State , 824 S.W.2d 568, 572-73 (Tex. Crim. App. 1992). To meet that burden, we have held that, under Rule 104(a) and 702, the proponent of scientific evidence must establish the relevancy (104(a) ) and the reliability (702) of the testimony to "help the jury reach an accurate result." Id. To prove reliability, we have said that the evidence must satisfy three criteria: (1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question. Id. at 573. But even if the reliability and relevancy are established, we have explained, the testimony might still be excluded if the trial judge determines that it should not be admitted under Rule 403 of the Texas Rules of Evidence. Id. ; see Tex. R. Evid. 403 (stating when relevant evidence should nonetheless be excluded).
In Kelly , we addressed DNA "fingerprint" evidence and later explained that our holdings in Kelly apply to Newtonian and some medical sciences. Coble v. State , 330 S.W.3d 253, 274 (Tex. Crim. App. 2010). Later, in Nenno v. State , 970 S.W.2d 549, 560-61 (Tex. Crim. App. 1998), we explained that the principles of Kelly also apply to "soft sciences," like the expert testimony about future dangerousness in Nenno . But, we noted that application of the Kelly factors depends on context when dealing with "soft sciences." Id.

Attached as Appendix A to this opinion.

Rep. R. vol. 4, 74.

Blasdell v. State , 470 S.W.3d 59 (Tex. Crim. App. 2015).

Morris v. State , 361 S.W.3d 649 (Tex. Crim. App. 2011).

Tillman v. State , 354 S.W.3d 425 (Tex. Crim. App. 2011) ; Weatherred v. State , 15 S.W.3d 540 (Tex. Crim. App. 2000).

Davis v. State , 329 S.W.3d 798 (Tex. Crim. App. 2010).

Davis v. State , 313 S.W.3d 317 (Tex. Crim. App. 2010) ; Russeau v. State , 171 S.W.3d 871 (Tex. Crim. App. 2005) ; Coble v. State , 330 S.W.3d 253 (Tex. Crim. App. 2010) ; Nenno v. State , 970 S.W.2d 549 (Tex. Crim. App. 1998).

Gallo v. State , 239 S.W.3d 757 (Tex. Crim. App. 2007).

Wolfe v. State , 509 S.W.3d 325 (Tex. Crim. App. 2017).

Jenkins v. State , 493 S.W.3d 583 (Tex. Crim. App. 2016) ; Jackson v. State , 17 S.W.3d 664 (Tex. Crim. App. 2000) ; Hinojosa v. State , 4 S.W.3d 240 (Tex. Crim. App. 1999) ; Massey v. State , 933 S.W.2d 141 (Tex. Crim. App. 1996) ; Campbell v. State , 910 S.W.2d 475 (Tex. Crim. App. 1995) ; Flores v. State , 871 S.W.2d 714 (Tex. Crim. App. 1993) ; Hicks v. State , 860 S.W.2d 419 (Tex. Crim. App. 1993) ; Kelly v. State , 824 S.W.2d 568 (Tex. Crim. App. 1992).

Bekendam v. State , 441 S.W.3d 295 (Tex. Crim. App. 2014).

Somers v. State , 368 S.W.3d 528 (Tex. Crim. App. 2012).

Bigon v. State , 252 S.W.3d 360 (Tex. Crim. App. 2008) ; Mata v. State , 46 S.W.3d 902 (Tex. Crim. App. 2001).

Vela v. State , 209 S.W.3d 128 (Tex. Crim. App. 2006).

Reynolds v. State , 204 S.W.3d 386 (Tex. Crim. App. 2006).

Hernandez v. State , 116 S.W.3d 26 (Tex. Crim. App. 2003).

Sexton v. State , 93 S.W.3d 96 (Tex. Crim. App. 2002).

Hartman v. State , 946 S.W.2d 60 (Tex. Crim. App. 1997).

Jordan v. State , 928 S.W.2d 550 (Tex. Crim. App. 1996).

Emerson v. State , 880 S.W.2d 759 (Tex. Crim. App. 1994).

Russeau , 171 S.W.3d 871.

Rep. R. vol. 3, 331.

Rep. R. vol. 3, 332.

Attached as Appendix A to this opinion.