In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-23-00152-CR
_____

ASPEN CANDACE HOLMES, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

**On Appeal from the 356th District Court**
**Hardin County, Texas**
**Trial Cause No. 26436**

_____

**MEMORANDUM OPINION**

A jury found Aspen Candace Holmes guilty of possession of a controlled substance, in an amount equal to or less than one gram, a state jail felony, and the trial court sentenced her to twelve months in jail. *See* Tex. Health & Safety Code Ann. § 481.115. In two issues, Holmes complains that the trial court erred by admitting evidence of contraband in violation of the Fourth Amendment of the

1

United States Constitution and Article 1, Section 9 of the Texas Constitution. We affirm.

**Background**

The trial evidence showed that in August 2020, Holmes was a passenger in a vehicle detained by a Lumberton Police Officer for a traffic violation. Officer Dale Tinsley, a patrol sergeant with the Lumberton Police Department, responded to a call to assist another officer at the traffic stop. Tinsley identified Holmes as a passenger in the stopped vehicle and testified that after Holmes exited the vehicle, he noticed that she kept her right arm across her chest area. Tinsley then noticed something underneath Holmes's top although Holmes assured him that she had nothing. Tinsley testified that he moved Holmes in front of a patrol car and turned her to face the dash camera in the patrol car. He then instructed her to pull her shirt and bra away from her body, without exposing herself, and shake her shirt and bra to see if anything fell out. Holmes complied, and a small plastic baggy fell at her right foot. Tinsley testified that the baggy was clear with yellow coloring and with what appeared to be worn-off smiley faces printed on it. Tinsley stated that they took possession of the baggy and believed that the powder inside the baggy was either cocaine or heroin. Tinsley testified that Holmes was handcuffed and detained, but

2

later released. According to Tinsley, a lab report later confirmed that the powder was positive for heroin.

Regarding Holmes's demeanor, Tinsley testified that Holmes understood his commands and order, was mentally cognizant of her surroundings, and had no indications of intoxication. Tinsley is familiar with the signs of heroin, opiate, or narcotic intoxication, and testified that Holmes did not exhibit any of those characteristics. Tinsley testified that he had reasonable suspicion that Holmes was concealing something based on her posture when she got out of the vehicle and based on her response to questions. Tinsley indicated that he was also suspicious of the bulge that Holmes kept trying to cover in her top. He also testified that he did not order Holmes, but instructed her to shake out her shirt, and she did not refuse. Tinsley testified that Holmes was consensual in following his instructions.

Tinsley's body camera video was admitted into evidence showing his interaction with Holmes. On the video, Holmes is seen exiting the vehicle and interacting with Tinsley while keeping her arms across her chest. After observing Holmes, Tinsley asks Holmes if she has anything in her bra and Holmes states that she does not. Tinsley informs Holmes that if a drug dog is called, it will alert if she has anything. Holmes continues to deny concealing anything in her bra. Tinsley then requested that Holmes shake out her shirt.

Next, Lumberton Police Department patrol sergeant Michael Strange testified. Strange testified that for officer safety, if there are multiple people in the stopped vehicle, it is normal to call for assistance from other available officers. Strange testified that two people were in the stopped vehicle on the night in question, one male and one female. The male was the driver, and the female was in the front passenger seat. Strange identified Holmes as the passenger. Strange testified that both individuals were still in the vehicle when he arrived, and the traffic stop was initiated because the vehicle "had white lights emitting to the rear."

Strange testified that he advised Officer Robison to see if he could search the vehicle, and then saw the driver exit the vehicle. Strange stated that Holmes exited the vehicle and stood in front of Officer Robison's patrol vehicle because when vehicles are searched, they do not allow anyone to stay inside the vehicle. According to Strange, Tinsley spoke with Holmes and then explained to Strange what he observed. Strange advised Tinsley to take Holmes in front of his patrol vehicle and have her shake her shirt out. Strange observed Holmes holding her right arm tightly to her body, and keeping her arms crossed as she was trying to hold or conceal something. This behavior is typical when someone is trying to conceal or hide something or keep something from falling. Strange testified that Holmes complied,

4

and a small object appeared to fall from her. Using his flashlight, Strange illuminated the item on the ground and retrieved it while Tinsley handcuffed Holmes.

Strange described the fallen item as a small plastic baggy with yellow and some writing on the outside and a powdery substance inside. Strange put the baggy on the hood of the car and observed it, though he could not identify the substance. Holmes was handcuffed and detained in Officer Robison's patrol vehicle. The male driver did not identify the powdery substance. The decision was made to ticket the male driver for the traffic offense, and release Holmes until the lab could identify the powdery substance. According to Strange, the baggy was photographed, weighed, sealed into an evidence bag, and locked in the evidence locker.

Strange testified that Holmes did not have a choice to remain in the vehicle during the search. While he observed Holmes inside the vehicle, he did not recall if she had any furtive movements or suspicious activity. Strange testified that he did not recall Holmes slurring her words, having red glassy eyes, having any cognitive difficulties, or showing signs of intoxication. Strange recalled Holmes standing with her arms held tightly against her chest and constantly touching areas of her bra. Based on what he observed and his conversation with Officer Tinsley, Holmes's behavior was indicative of her attempting to conceal something illegal. Strange acknowledged that once Holmes got out of the vehicle, she could have walked off

without a problem. Strange testified that Holmes could have declined to shake her shirt as Officer Tinsley requested and walked off, but she consented to doing so. Strange further acknowledged that he did not know if Holmes was informed that she could leave prior to having her shake her shirt.

Strange's body camera video was admitted into evidence, and it shows Holmes's interaction with the officers. The dash camera video of Officer Robison, the officer that initiated the traffic stop, was also admitted into evidence. The dash camera video indicates that once the driver gave permission for officers to search his vehicle, the driver instructed Holmes to exit the vehicle.

Next, the State called the evidence technician for the Lumberton Police Department, Brent Powell. Powell testified that he delivers sealed evidence from the Lumberton Police Department to the crime lab in Houston for analysis. The evidence is in an envelope that Powell is unable to see through once retrieved from a lock box at the police station. Powell testified that he picks up the evidence and it is stored in the locked evidence room.

The State called Veronica Pando, a forensic scientist in the seized drug section at the Texas Department of Public Safety Crime Lab in Houston. Pando testified that she works in a discipline where unknown substances are tested to determine whether it contains any controlled substances. She explained that evidence receiving

6

technicians take the evidence, assign the case ID number for the Houston lab, and put the evidence in the seized drug vault until it is retrieved for analysis. Pando testified the testing process begins with weighing the substance without the packaging, and this substance weighed 0.15 grams. She then takes a small portion of the substance for chemical testing, another small portion for instrumental analysis, and then returns the remaining portion to the original packaging. Here, Pando testified that "the after-analysis weight" of the substance was 0.14 grams. Pando detailed that the chemical analysis provides the possible drug classification, and the instrumental analysis provides data used to match a known reference and get a positive identification. Pando determined the substance was heroin.

Holmes did not call any witnesses in her defense.

After deliberations, the jury found Holmes guilty of possession of a controlled substance of heroin of less than one gram.

Holmes elected to have the trial judge assess her punishment. Holmes testified at the punishment hearing and stated that she missed her pre-sentence investigation interview because she did not realize that she had to return for it. According to Holmes, she has not been arrested since her arrest in this case two years ago, she is employed, and she is in substance abuse treatment. She takes methadone as part of

her treatment. Holmes testified that she has fourteen-year-old twins, and that her son lives with her but her daughter lives with Holmes's dad.

Holmes testified that she had a warrant in Jefferson County, Texas, and she spent sixty days in jail for a misdemeanor drug charge before her arrest for the charges in this case. Holmes testified that she did not have any drugs on her on the day of this incident, though she does not believe the police planted anything on her.

At the conclusion of the hearing, the trial judge sentenced Holmes to twelve months in state jail, with credit for time served as allowed by law.

In two issues, Holmes argues that it was error to admit the contraband because the warrantless search of Holmes was a violation of the Fourth Amendment of the United States Constitution and Article 1, Section 9 of the Texas Constitution.

**Standard of Review**

We review the trial court's decision to admit evidence under an abuse of discretion standard. *See Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *See Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

The Fourth Amendment and Article I, Section 9 of the Texas Constitution guarantees the right of the people to be "secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV; *see* Tex. Const. art. I, § 9.[1] When a defendant moves to suppress evidence obtained during a police search that was allegedly conducted in violation of the Fourth Amendment, the defendant bears the initial burden to provide evidence rebutting the presumption of proper police conduct. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005); *see also State v. Martinez*, 569 S.W.3d 621, 623–24 (Tex. Crim. App. 2019) (citations omitted). "A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant[]" because "a search conducted without a warrant issued upon probable cause is per se unreasonable…subject only to a few specifically established and well-delineated exceptions." *Ford*, 158 S.W.3d at 492; *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Once it is established that the search was conducted without a warrant, the burden shifts to the State to prove an exception to the rule against warrantless searches applies. *See Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008) ("Evidence seized by the police without a warrant may be admitted only if an exception to the Fourth Amendment's warrant requirement applies."). Voluntary consent is an exception to the warrant requirement

---

[1]Although Holmes asserts violations of both the Fourth Amendment and Article I, Section 9, she does not argue Article I, Section 9 affords broader protections, so we analyze this case under the Fourth Amendment. *See Limon v. State*, 340 S.W.3d 753, 757 n.15 (Tex. Crim. App. 2011).

9

for searches, and a person can consent orally, by action, or may be shown by circumstantial evidence. *See Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012) (citing *Schneckloth*, 412 U.S. at 219); *Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010) (citations omitted).

To establish the consent exception, the State must prove by clear and convincing evidence that consent was "positive and unequivocal and there must not be duress or coercion, actual or implied" and it must be given freely and voluntarily. *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985) (citations omitted); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). An officer's testimony that consent was given voluntarily and without coercion may be sufficient to prove voluntariness of the consent. *See Martinez v. State*, 17 S.W.3d 677, 683 (Tex. Crim. App. 2000). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; *see also Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010) (explaining that whether consent was given voluntarily under the Fourth Amendment is a fact question to be given deference).

To determine whether consent was given voluntarily, the trial court can look at "the circumstances leading up to the search, the reaction of the accused to

pressure, and any other factor deemed relevant." *Reasor*, 12 S.W.3d at 818. Other factors that trial courts should consider include: the consenting person's age, education, and intelligence; any constitutional advice given, such as whether the consenting person had the option to refuse consent; whether the consenting person was in custody or restrained at the time, and the length of any such detention; and whether weapons were drawn. *See id.* (citing *Schneckloth*, 412 U.S. at 226). The trial court should further consider if the suspect was informed of the right to withhold consent. *See Meeks*, 692 S.W.2d at 510. "The showing that a suspect has been warned that he does not have to consent to the search and has a right to refuse is of evidentiary value in determining whether a valid consent was given." *Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991).

## Analysis

Holmes argues that she did not voluntarily consent to be searched, and she complied with the officer's instruction to shake her shirt only after officers told her that a drug dog could be brought to the scene and would alert to any drugs by scratching and biting her. She argues that the baggy was only recovered due to her submission to a claim of authority from the officers.

The record shows that Holmes was asked to exit the vehicle once the driver consented to a search of the vehicle. Officers observed Holmes keep her arms

11

crossed and testified that Holmes's demeanor indicated that she was trying to conceal something. Officers could see a bulge underneath her top. During that time, Holmes was not under arrest and not handcuffed.

The record further confirms that Holmes was told that a drug dog could be called, and contrary to Holmes's assertion, Tinsley's body camera video does not confirm that Tinsley told Holmes a dog would alert by biting or scratching her. In response, Holmes continued to assure officers that she had nothing on her though she continued to cross her arms to conceal something. At that point, the officers requested that Holmes pull her shirt out and away from her body, and the drugs fell to the ground, although the record also shows the officers did not tell her she had the right to refuse. *See Tucker*, 369 S.W.3d at 185 (outlining factors for determining voluntariness of consent). Officers did not mistreat Holmes, use trickery, threats of violence, or promise her anything. *See id.* The record further shows that Holmes did not appear to be intoxicated or under the influence of any narcotics, and was able to answer, understand, and interact with officers.

Though officers informed Holmes that a drug dog could alert if she had contraband, Holmes continued to deny that she was concealing anything and did not acquiesce or verbally consent to a search in response. The record contains no evidence that shows Holmes's will was overborne or her capacity for self-

12

determination was critically impaired. *See Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011) (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)). After considering the totality of the circumstances and the various factors, the record shows that Holmes voluntarily consented, which is an exception to the warrant requirement. *See id.* at 459–60; *Valtierra*, 310 S.W.3d at 448.

Since Holmes voluntarily consented to being searched, the trial court did not abuse its discretion in admitting evidence of Holmes's possession of contraband into evidence. *See Meekins*, 340 S.W.3d at 459-60; *Valtierra*, 310 S.W.3d at 448.

We overrule issues one and two.

## Conclusion

Having overruled all of Holmes's issues, we affirm the trial court's judgment. AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on December 2, 2024
Opinion Delivered July 23, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

13