

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00202-CR

_____

GEORGE LATHANIEL ROBERTSON, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1766992

---

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant George Lathaniel Robertson appeals his convictions for sexual assault and assault of a family member by strangulation. *See* Tex. Penal Code Ann. §§ 22.01(b)(2)(B), 22.011(a)(1). He claims that (1) the trial court abused its discretion by admitting a forensic nurse examiner's expert testimony regarding strangulation and (2) the sexual-assault punishment charge used an outdated parole instruction that erroneously referenced good-conduct time.[1] Because there was no error in the first instance and no harm in the second, we will affirm.

## I. BACKGROUND

Robertson dated the complainant—Natalie Taylor—when the two were teenagers, and they had a daughter together before going their separate ways. Years later, in 2020, Taylor moved back to the North Texas area, and she and Robertson began an "[o]n again, off again" sexual relationship.

### A. ASSAULTS

The relationship continued intermittently through March 2021, at which point Robertson took an emotional cross-country road trip. Upon arriving back in Texas, he drove straight to Taylor's door and showed up unannounced. Taylor was in the process of preparing her daughter for school at the time, but she allowed Robertson to nap in her home temporarily. When Robertson awoke, Taylor suggested that they

---

[1]We have reordered Robertson's points for organizational purposes.

go to a restaurant to talk. But Robertson instead began "trying to be affectionate" with her, ignoring her requests for him to stop until she became "more assertive" in "telling him no." This upset Robertson, and he began accusing Taylor of sleeping with other men and demanding to see her phone. As the argument escalated, Robertson "put his hands on [her] around [her] throat." Taylor later recalled how he "had [her] by [her] neck," pinned against a wall such that she "felt like [she] couldn't breathe," and when she "tried . . . [to] tell him to stop," she "couldn't talk."

Robertson eventually let go of Taylor and the argument resumed. Taylor attempted to flee to a neighbor's house,[2] and although her knocking was captured on the neighbor's video doorbell—a fact that would become important later—the neighbor was not home. Robertson, who had followed Taylor outside, grabbed her by the arm, and they returned to her home. Once there, Robertson held Taylor down on the floor, hit her repeatedly in the back of the head, and held her hands above her head while he raped her.[3]

Soon after the rape, Taylor's neighbor—who had become "[v]ery concerned" upon seeing video of Taylor's "terrified" knocking through the doorbell notification

---

[2]Taylor stated that, prior to leaving her home, she grabbed a steak knife to protect herself, storing the knife in her leggings. Later—just before the rape—Robertson found the knife and threw it to the side, asking Taylor what she had planned to do with it.

[3]Taylor told the jury that, as Robertson was holding her hands above her head and undressing her, she told him, "Please, no[; s]top," and urged him to think of his children.

on her phone—came to Taylor's door in an attempt to "lure her out of the home away from [Robertson]." Taylor left with the neighbor, and after Taylor confirmed that she needed help, the neighbor called 911.

Taylor subsequently went to the hospital, where Nurse Kenyon—a forensic nurse examiner[4]—performed a full examination. Robertson, meanwhile, was arrested and indicted for sexual assault and assault of a family member by strangulation.[5]

## B. TRIAL

Robertson's case was tried to a jury. At trial, Robertson attempted to frame the incident as consensual rough sex. Taylor conceded that she and Robertson had engaged in "rough sex" in the past—including consensual sex in which Robertson "would place his hands on [her] throat"—but she insisted that the consensual sex had never involved "anything where [she] felt like [she] couldn't breathe," and she emphasized that she had not consented to sex on the day in question and had told Robertson to stop.

As the trial progressed, the State called Nurse Kenyon as a witness. Prior to her testimony, the trial court held a hearing (outside the jury's presence) to vet her expert qualifications, and at the conclusion of that hearing, Robertson objected to

---

[4]Nurse Kenyon explained that a forensic nurse examiner and a sexual assault nurse examiner (SANE) "are essentially the same thing."

[5]Robertson was indicted for a third count as well, but the State dropped the third count before trial.

Nurse Kenyon's offering expert testimony "with regard to [the] specifics of strangulation." The trial court overruled this objection, allowing Nurse Kenyon to testify as both a fact witness (regarding her examination of Taylor) and as an expert witness on strangulation.

After hearing this and other testimony,[6] the jury found Robertson guilty of both sexual assault and assault of a family member by strangulation. *See id.* §§ 22.01(b)(2)(B), 22.011(a)(1).

The trial then proceeded to the punishment phase, and after the parties presented additional evidence, the court charged the jury on punishment. As relevant here, the punishment charge informed the jury of the existence of good-conduct time and its potential application to a given defendant. The charge stated that, under the applicable law, a defendant "may earn time off the period of incarceration imposed through the award of good[-]conduct time." And in instructing the jury regarding a given sexual-assault offender's minimum length of incarceration prior to parole eligibility, the charge provided that such length would be measured "without consideration of any good[-]conduct time he may earn." Regardless, the court's charge cautioned the jury that "[i]t [could ]not accurately be predicted how the parole law and good[-]conduct time might be applied to this defendant" and thus instructed

---

[6]In addition to calling Taylor and Nurse Kenyon, the State offered testimony from, *inter alia*, Taylor's neighbor, Taylor's roommate, and the officer who responded on the day of the incident.

the jury that, while it could "consider the existence of parole law and good[-]conduct time," it could "not . . . consider the extent to which good[-]conduct time may be awarded to or forfeited by this particular [d]efendant," nor could it consider "the manner in which the parole law may be applied to this particular defendant." Robertson did not object to this portion of the charge.

After deliberating, the jury assessed Robertson's punishment at 22 years' confinement for sexual assault and 6 years' confinement for assault of a family member by strangulation.[7]

## II.  DISCUSSION

Robertson raises two challenges to his convictions.  He claims that the trial court erred by (1) admitting Nurse Kenyon's expert testimony on strangulation and (2) referencing good-conduct time in the punishment charge's sexual-assault parole instruction.

### A.  NO ERROR:  ADMISSION OF EXPERT TESTIMONY

Robertson first contends that Nurse Kenyon lacked sufficient qualifications to offer expert testimony on strangulation and thus that the trial court erred by admitting such testimony.

---

[7]The two offenses were accompanied by repeat-offender allegations, and Robertson pleaded true to those allegations, so his punishment ranges were enhanced. *See* Tex. Penal Code Ann. § 12.42.

6

## 1. Standard of Review and Governing Law

A trial court may admit expert testimony from a witness who is "qualified as an expert by knowledge, skill, experience, training, or education" if the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702; *see Kingsbury v. State*, 625 S.W.3d 686, 690 (Tex. App.—Fort Worth 2021, no pet.). The admission of expert testimony generally requires a three-pronged analysis— determining qualifications, reliability, and relevance—but only the first prong is at issue here: the witness's qualifications. *See Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Kingsbury*, 625 S.W.3d at 690.

Under this prong, to qualify as an expert, a witness must not only have sufficient training and experience in a particular field, but her background must be tailored to the specific area of expertise on which she intends to opine. *Rhomer*, 569 S.W.3d at 669; *Vela*, 209 S.W.3d at 131–33; *Kingsbury*, 625 S.W.3d at 690–91. "The focus . . . is on the 'fit' between the subject matter at issue and the expert's familiarity therewith." *Vela*, 209 S.W.3d at 133 (quoting *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)); *see Rhomer*, 569 S.W.3d at 669.

When, as here, a trial court determines that a witness is sufficiently qualified to testify as an expert on a given subject, we review that ruling for an abuse of discretion. *Rhomer*, 569 S.W.3d at 669. A trial court abuses its discretion if it rules arbitrarily or

without reference to guiding rules or principles; it does not abuse its discretion if its ruling is within the zone of reasonable disagreement. *Id.* To determine whether a trial court abused its discretion in ruling that a witness was qualified to offer expert testimony, we may consider the complexity of the field of expertise, whether the expert's opinion was conclusive, and how central the area of expertise was to the resolution of the case. *See id.* at 669–70 (referring to such considerations as the "*Rodgers* factors"); *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006); *Kingsbury*, 625 S.W.3d at 691.

## 2. No Error

The substance of Nurse Kenyon's expert testimony—which was limited to the basics of strangulation and the symptoms it could cause—was well within her area of expertise as a full-time forensic nurse examiner. In other words, the two "fit." *See Rhomer*, 569 S.W.3d at 669 ("'Fit' is a component of qualification."); *Vela*, 209 S.W.3d at 133 (discussing "'fit' requirement").

### a. Nurse Kenyon's testimony

The challenged portions of Nurse Kenyon's testimony were relatively brief, constituting just five pages of the trial transcript. In that testimony, Nurse Kenyon

- Clarified the meaning of several strangulation-related terms, such as *asphyxiation* and *occlusion*;

- Identified various anatomical components of the neck, such as the jugular veins, trachea, and carotids;

8

- Quantified the amount of pressure needed to occlude the jugular vein and thereby "affect oxygenation in the body" and contrasted it with the amount of pressure needed to occlude carotids or the trachea;

- Estimated the length of time the relevant amount of pressure would need to be applied to render someone unconscious; and

- Discussed certain symptoms that the victim might exhibit after strangulation—such as petechiae in the eyes or marks on the neck—and explained what those symptoms looked like, what they reflected, and why they might or might not be present in a given patient.[8]

### b. Nurse Kenyon's background

When asked about her qualifications, Nurse Kenyon testified that she held a bachelor of science in nursing and had thirteen years of experience as a registered nurse, including six years as an emergency-room nurse[9] and five additional years as a full-time forensic nurse examiner. At the time of trial, she led a team of forensic nurse examiners who together "provide[d] services to sexual assault victims 24/7." She confirmed that she had been certified as a forensic nurse examiner for five years, that she had recertified every two years, that she held a separate certification to perform domestic-violence examinations, and that she had also completed a three-day course specific to strangulations.

---

[8]For example, when discussing petechiae in the eyes, Nurse Kenyon stated that they looked like "little red marks" or "faint patchy redness," she confirmed that they reflected "tiny blood vessels bursting" due to "increased venous pressure," and she noted that they could be caused by events other than strangulation.

[9]Nurse Kenyon confirmed that, during her time as an emergency-room nurse, she frequently saw trauma victims.

During her qualification hearing, Nurse Kenyon noted the crossover between domestic violence and strangulation. She explained that the majority of sexual assaults are committed by persons known to the victims, that it is not uncommon for strangulations to occur in the context of domestic-violence relationships, and that "68 percent of women who are in an intimate[-partner] violen[ce] situation have been strangled." Given this, her training for domestic-violence examinations had included some education on strangulations as well.

Nurse Kenyon further testified that she had practical experience in treating and identifying the symptoms of strangulation. She stated that, when she examined sexual-assault victims—which, again, she did full time—she performed a "focused strangulation assessment" on any victim who reported that her breathing had been impaired. Such assessment included identifying and documenting the lingering physical symptoms of the strangulation, such as petechiae in the victim's eyes.

### c. The fit

Robertson contends that Nurse Kenyon lacked sufficient training and experience to testify on the "specifics of strangulation" as she did. He notes that she did not possess a medical degree and argues that her training as a nurse and completion of a three-day strangulation course were insufficient to make her an expert on the subject. But Nurse Kenyon had more experience than Robertson acknowledges, and her testimony "fit" within that experience. *See Rhomer*, 569 S.W.3d at 669; *Vela*, 209 S.W.3d at 133.

10

Nurse Kenyon had extensive practical experience performing focused strangulation assessments and treating patients whose situations put them at risk for strangulation. As she explained, this experience required her to understand the physical effects of strangulation and to identify the injuries that might result from it. She testified that such assessments were part of her full-time job as a forensic nurse examiner, a job she had held for five years. And of course, her training—not only the three-day course in strangulation but also her training as a registered nurse, as a forensic nurse examiner, and as a domestic-violence examiner—had equipped her to perform these job functions.

Against this backdrop, Nurse Kenyon's expert testimony provided the jury with general information to clarify what strangulation entails from a medical perspective. Such testimony was not complex, conclusive, or central to the case. She did not testify, for example, that she had employed a difficult-to-understand scientific procedure to identify the statistical likelihood that Robertson had strangled Taylor against her will. *See Rodgers*, 205 S.W.3d at 528 (discussing factors relevant to qualifications analysis—complexity, conclusiveness, and centrality—and listing DNA profiling as an example of a complex field and frequency of a DNA match's occurrence as an example of a conclusive expert opinion). Indeed, her expert testimony said nothing about the central point in dispute: whether Robertson had engaged in consensual rough sex with Taylor or had choked and raped her against her will. *Cf. id.* (noting that "[t]he more dispositive [the expert testimony] is of the

11

disputed issues, the more important the expert's qualifications are"). Nurse Kenyon simply provided background information regarding what strangulation was, how much pressure was generally required to impede normal breathing, and what injuries or symptoms could result.[10] And while proving strangulation was undeniably vital to the State's case, *see* Tex. Penal Code Ann. § 22.01(b)(2)(B) (defining offense to require evidence that defendant "imped[ed] the normal breathing . . . of the [victim] by applying pressure to [her] throat or neck"), Robertson did not bicker with Taylor over the precise amount of pressure applied or the precise nature of her injuries—he bickered with her over whether she had accurately reported what had occurred and whether her symptoms were the result of consensual rough sex.

Given the absence of complexity, conclusiveness, and centrality from Nurse Kenyon's expert testimony, her discussion of the basics of strangulation "fit" well within her area of expertise. The trial court was within the bounds of its discretion to admit this testimony. *See Rhomer*, 569 S.W.3d at 670 (holding trial court did not abuse discretion by admitting expert testimony on accident reconstruction where "two of the three *Rodgers* factors [i.e., complexity and conclusiveness] weigh[ed] in favor of upholding the trial court's ruling"). We overrule this point.

---

[10]Robertson challenges only Nurse Kenyon's abstract expert testimony on the "specifics of strangulation"; he does not challenge her testimony regarding her examination of Taylor and Taylor's symptoms.

## B. No Egregious Harm: Punishment Charge

In his second and final point, Robertson argues that the trial court egregiously harmed him because, when it instructed the jury regarding an abstract sexual-assault offender's parole eligibility, the court used an outdated instruction that referenced good-conduct time—a reference missing from the current statutorily mandated charge language applicable to the offense. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a); *Weaver v. State*, No. 02-21-00081-CR, 2022 WL 2978730, at *4 (Tex. App.—Fort Worth July 28, 2022, pet. ref'd) (mem. op., not designated for publication) (noting 2019 change in law such that "Article 37.07, Section 4(a) of the Code of Criminal Procedure no longer refers to good-conduct time"). Specifically, the trial court instructed the jury that, for purposes of parole eligibility, a sexual-assault offender's incarceration would be measured "without consideration of any good[-]conduct time he may earn."[11]

---

[11]It is unclear if Robertson intends to challenge all of the references to good-conduct time in the punishment charge or if he intends to limit his challenge to the reference to good-conduct time in the sexual-assault parole instruction. He does not identify or cite any authority regarding the statutory parole instruction applicable to a charge of assault on a family member by strangulation. And as the State points out, that statutory instruction does, in fact, include language regarding good-conduct time. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(c) (providing parole instruction with reference to good-conduct time applicable "if the offense is punishable as a felony of the second or third degree[ or] if a prior conviction has been alleged for enhancement as provided by Section 12.42(a)"); Tex. Penal Code Ann. §§ 12.42(a) (providing for enhancement of punishment range in third-degree felony trial based on prior felony conviction), 22.01(b)(2)(B) (making assault on a family member by strangulation a third-degree felony).

We have repeatedly held similar outdated references to good-conduct time to be erroneous. *See Ramirez v. State*, No. 02-22-00194-CR, 2024 WL 190723, at *2 (Tex. App.—Fort Worth Jan. 18, 2024, pet. ref'd) (mem. op., not designated for publication) (holding trial court erred by giving outdated parole instruction that referenced good-conduct time); *Perez v. State*, No. 02-22-00245-CR, 2023 WL 8112900, at *3 (Tex. App.—Fort Worth Nov. 22, 2023, pet. ref'd) (mem. op., not designated for publication) (similar); *Pedersen v. State*, No. 02-23-00024-CR, 2023 WL 7852073, at *2 (Tex. App.—Fort Worth Nov. 16, 2023, pet. ref'd) (mem. op., not designated for publication) (similar); *Bailey v. State*, No. 02-22-00186-CR, 2023 WL 5766138, at *5 (Tex. App.—Fort Worth Sept. 7, 2023, no pet.) (mem. op., not designated for publication) (similar); *Weaver*, 2022 WL 2978730, at *4 (similar). Regardless, erroneous or not,[12] the reference to good-conduct time in the sexual-assault portion of the punishment charge did not cause Robertson egregious harm.

---

However, the statutory instruction for Robertson's sexual-assault charge does not mention good-conduct time, *see* Tex. Code Crim. Proc. Ann. art. 37.07, § 4(a), and the punishment charge in this case included a reference to good-conduct time in the paragraph specific to a sexual-assault offender's parole eligibility. To put a finer point on it, the charge stated that a defendant's minimum incarceration prior to becoming parole eligible would be measured "without consideration of any good[-]conduct time he may earn." Given the ambiguity in Robertson's brief, we construe his challenge as limited to the sexual-assault parole instruction's language, and we limit our harm analysis accordingly. *See* Tex. R. App. P. 38.9 (requiring briefs to "present argument that will enable the court to decide the case").

[12]The State does not concede that the parole instruction's reference to good-conduct time was erroneous. *Cf. Ramirez*, 2024 WL 190723, at *2 (noting State conceded error); *Perez*, 2023 WL 8112900, at *3 (same); *Pedersen*, 2023 WL 7852073,

## 1. Standard of Review

When, as here, a defendant does not object to an erroneous jury instruction, the unpreserved charge error warrants reversal only if it resulted in egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *Ramirez*, 2024 WL 190723, at *2; *Perez*, 2023 WL 8112900, at *3. An error results in egregious harm if it "affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Reed v. State*, 680 S.W.3d 620, 626 (Tex. Crim. App. 2023); *see Ramirez*, 2024 WL 190723, at *2; *Bailey*, 2023 WL 5766138, at *6. The harm inflicted must be actual rather than merely theoretical. *Reed*, 680 S.W.3d at 626.

In determining whether a charge error resulted in egregious harm, we consider (1) the jury charge as a whole; (2) the state of the evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the record. *Reed*, 680 S.W.3d at 626; *Almanza*, 686 S.W.2d at 171; *Ramirez*, 2024 WL 190723, at *2; *Perez*, 2023 WL 8112900, at *4.

---

at *2 (same); *Bailey*, 2023 WL 5766138, at *5 (same); *Weaver*, 2022 WL 2978730, at *4 (same). Rather, it claims that the one-phrase departure from the statutory language merely clarified the application of good-conduct time to a sexual-assault offender and that such clarification was necessitated because Robertson was also charged with (enhanced) assault of a family member by strangulation, which required the jury to be instructed on the existence of good-conduct time. *But cf. Perez*, 2023 WL 8112900, at *3 (holding outdated good-conduct reference was erroneous in case involving both aggravated sexual assault and assault family violence). We need not resolve this issue because, even assuming error, the sexual-assault parole instruction's reference to good-conduct time was not egregiously harmful. *See* Tex. R. App. P. 47.1.

15

## 2. No Egregious Harm

None of the egregious-harm factors—the charge as a whole, the state of the evidence, the arguments of counsel, or other record considerations—show that Robertson was egregiously harmed.

### a. Charge as a whole

First, although the sexual-assault parole instruction referenced good-conduct time, the charge also contained the "standard curative language" admonishing the jury that it could "not . . . consider the extent to which good[-]conduct time may be awarded to or forfeited by this particular Defendant." *Igo v. State*, 210 S.W.3d 645, 647 (Tex. Crim. App. 2006) (noting that sexual-assault charge as a whole weighed against egregious harm when parole instruction was erroneous but "contained the standard curative language admonishing the jury not to consider the extent to which the parole law might be applied to the defendant"). We presume that the jury complied with this instruction. *See Reed*, 680 S.W.3d at 627 (performing egregious-harm analysis and noting that "[w]e generally presume that the jury followed the trial court's instructions"). And as in *Ramirez*, *Perez*, *Bailey*, and *Weaver*, nothing in the record indicates that the jury did otherwise. *See Ramirez*, 2024 WL 190723, at *2; *Perez*, 2023 WL 8112900, at *4; *Bailey*, 2023 WL 5766138, at *6; *Weaver*, 2022 WL 2978730, at *5. The charge as a whole weighs against a finding of egregious harm.

## b. State of the evidence

The same is true of the state of the evidence; it weighs against egregious harm. Although Robertson emphasizes the alleged lack of eyewitness testimony supporting his guilt, this argument not only ignores the eyewitness testimony from Taylor but also overlooks the timing of the erroneous instruction. The reference to good-conduct time came not in the guilt–innocence jury charge, but in the punishment jury charge. By then, the jury had already found Robertson guilty of the offenses of sexual assault and assault of a family member by strangulation, reflecting that it believed Taylor's testimony and considered Robertson's guilt to have been proven beyond a reasonable doubt. *See Weaver*, 2022 WL 2978730, at *5 (noting similarly in egregious-harm analysis of erroneous parole instruction that referenced good-conduct time).

And the evidence presented during the punishment phase made it unlikely that the good-conduct reference caused Robertson any actual harm. *Cf. id.* (noting that, "[u]nder this prong, we consider the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused [the appellant] actual harm"). The State presented evidence that Robertson had numerous prior convictions, including convictions for aggravated assault with a deadly weapon, assault causing bodily injury, recklessly discharging a firearm, criminal mischief, resisting a search or arrest, and criminal trespass. And for two of those offenses, Robertson had been placed on deferred adjudication initially but had violated the terms of his probation.

There was also evidence of Robertson's other bad acts. One of his ex-girlfriends testified to his physical abuse, recalling two different occasions on which Robertson choked her—one of which occurred while she was pregnant with their son.[13]

Even Robertson concedes that his 22-year sexual-assault sentence was "at the low end of the range" and that it could "fairly raise an argument that the error was harmless." We agree; he received nowhere near the maximum life sentence.[14] The state of the evidence makes it unlikely that the parole instruction's reference to good-conduct time actually harmed Robertson. *See Ramirez*, 2024 WL 190723, at *3 (weighing state of the evidence against egregious harm when jury heard evidence of defendant's prior criminal offenses and assessed punishments that were "not near the maximum" of the ranges); *Perez*, 2023 WL 8112900, at *4 (similar, weighing state of the evidence against egregious harm when jury heard evidence of prior criminal offenses and sentences were "the minimum and the middle of [the two] offenses' respective ranges").

---

[13]Robertson, for his part, emphasized his mental-health issues. His mother and aunt testified on his behalf, and they told the jury that he was bipolar, that he had been diagnosed with "major depression," and that he spent time in a mental-health facility as a child. He also offered testimony from a sexual partner who stated that he had never been violent towards her and that they remained close friends.

[14]For the offense of sexual assault, and because Robertson pleaded true to the allegations that he was a repeat offender, he faced a punishment range of 5 to 99 years or life. *See* Tex. Penal Code Ann. §§ 12.32(a), 12.42(b), 22.011(a)(1), (f).

### c. Arguments of counsel

As for the arguments of counsel, neither the State nor Robertson made any mention of good-conduct time,[15] and Robertson concedes as much. He argues, though, that his counsel's reference to his needing to serve at least half of his sexual-assault sentence—an implied reference to his parole eligibility—aggravated the harm. We fail to see how. Robertson's counsel's implied reference to parole said nothing about his eligibility for good-conduct time, and to the extent that it might have caused the jury to seek clarification from the punishment charge, that charge expressly stated that a sexual-assault offender's parole eligibility would be calculated "without consideration of any good[-]conduct time."[16]

This factor weighs against a finding of egregious harm. *See Igo*, 210 S.W.3d at 647 (weighing factor against egregious harm when neither party mentioned erroneous parole instruction during punishment arguments); *Ramirez*, 2024 WL 190723, at *3 (weighing factor against egregious harm when erroneous good-conduct reference was not mentioned in arguments of counsel); *Perez*, 2023 WL 8112900, at *4 (same); *Weaver*, 2022 WL 2978730, at *6 (same).

---

[15]Robertson's counsel emphasized his mental-health issues to the jury and asked the jury to consider whether prison would provide the mental-health treatment that Robertson needed and whether taking him away from his family was in the best interest of society.

[16]The charge also instructed the jury "not to consider the manner in which the parole law may be applied to this particular [d]efendant."

### d. Other record considerations

There are no other considerations in the record to indicate that the sexual-assault parole instruction's reference to good-conduct time actually harmed Robertson. Although Robertson reiterates his assertion that [t]his was not an open-and-shut case" in light of his prior relationship with Taylor, such assertion is neither an additional consideration—having already been considered as part of the state of the evidence—nor is it persuasive. As previously noted, the erroneous instruction was included in the jury charge on punishment—not the charge on guilt–innocence. So by the time the jury saw the reference to good-conduct time, it had already found Robertson guilty beyond a reasonable doubt. *See Perez*, 2023 WL 8112900, at *4 (rejecting defendant's argument that "guilt was 'hotly contested'" as additional record consideration and noting that such argument did not show actual harm from outdated instruction referencing good-conduct time).

This factor, like the others, weighs against a finding of egregious harm. *See Bailey*, 2023 WL 5766138, at *6 (noting that appellant did not identify any additional considerations in the record to show harm and rejecting appellant's repetition of broad allegations as additional considerations); *Weaver*, 2022 WL 2978730, at *6 (weighing factor against egregious harm when no other record considerations showed harm).

### e. No egregious harm

Because none of the egregious-harm factors indicate that the sexual-assault instruction's reference to good-conduct time actually harmed Robertson, the instruction did not cause him egregious harm. We overrule this point.

## III. CONCLUSION

Having overruled Robertson's two points, we affirm the trial court's judgments. *See* Tex. R. App. P. 43.2(a).

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 22, 2024