**Opinion issued September 25, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00260-CR

———————————

**LUIS ALEJANDRO VALENCIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1773149**

---

## MEMORANDUM OPINION

Rejecting his claim of self-defense, a jury found Luis Alejandro Valencia guilty of murder and assessed punishment of fifty-five years in prison and a ten-thousand-dollar fine. The trial court entered judgment in accordance with the jury's

verdict. Appellant appeals, claiming the trial court erred by excluding evidence of the victim's prior crimes and gang membership. We affirm.

## Background

### A. Events leading up to the altercation and shooting

In February 2022, Erik Villeda and his wife, Johanna Vega, got into an argument. Villeda left their home and went to a club. Vega later went to the club to find Villeda, without success. Vega met Appellant at the club and asked if he had seen Villeda. Appellant responded that he did not know Villeda but would help find him. Appellant gave Vega his social media contact information, and Vega returned home.

The following morning, Appellant contacted Vega and told her Villeda was at another club called Los Corrales. At some point, Vega and Appellant communicated via social media, and Vega told him she was at Los Corrales. The two arranged to meet there, with Vega sending Appellant a "pin" of her location.

Appellant drove to Los Corrales, parked his car across from and facing the club's entrance, and waited. Appellant sent Vega a message to let her know he had arrived. He also flashed his headlights, which attracted the attention of Los Corrales's security guard, Brian Flutsch.

Flutsch approached Appellant's car, and Appellant said he was looking for his "girlfriend." Appellant showed Flutsch a picture of Vega and asked if he would go

2

into Los Corrales and get her. Flutsch recognized Vega as having been at Los Corrales that day, so he went inside to find her but was unable to do so. Flutsch returned to Appellant's car and said he was unable to find Vega, but Appellant could go inside Los Corrales and look for her. Appellant declined that invitation and remained in his car, and Flutsch went back inside the club.

## B.     The altercation and shooting

Flutsch returned to Appellant's car a short time later, where Appellant was still seated in the driver's seat. This time, Flutsch brought Villeda with him. According to Vega, Villeda was "very intoxicated" that day and "did look like he was coked up," and toxicology reports later confirmed that Villeda had consumed both alcohol and cocaine.

There was conflicting testimony at trial about the reason Villeda came with Flutsch to Appellant's car. Flutsch testified that Appellant asked him to bring Villeda; Appellant testified Villeda came of his own accord. There was also conflicting testimony about whether Appellant and Villeda had ever met before. Appellant's testimony suggests he did not recognize Villeda, but Flutsch testified it appeared Villeda recognized Appellant and "didn't want to speak [in front of Flutsch] because . . . it was probably personal business." Vega testified Villeda was "a fighter" and would "tell you he would love to fight."

3

Flutsch testified as follows regarding the altercation and shooting. Villeda told Appellant to step outside his car, but Appellant remained in the driver's seat. Appellant did not appear to want an altercation, so Flutsch told Villeda to go back inside Los Corrales and told Appellant to leave. But the two men continued to argue. Villeda reached inside the car and pushed and grabbed Appellant, "[s]hoving him back and forth" and "[b]opping his head a little bit." Villeda never choked Appellant, and throughout this episode, Appellant was "sitting in there patiently smiling, telling him he doesn't want an altercation and if there was an altercation that he would beat him up." When Appellant reached for what Flutsch believed was a gun, Flutsch "lunge[d]" into Appellant's car and began struggling with him, and Villeda also gave Appellant "like two, three punches, blows to the head." Appellant jumped from the driver's seat into the passenger seat and kicked the driver's side door open, but Flutsch kicked it shut again, pushing Appellant back into the car. As the struggle continued, Flutsch heard a "click sound" that he understood to mean Appellant had a gun "ready to shoot." Flutsch gave Appellant a shove and turned to run back toward Los Corrales. As he began to run, Flutsch saw Villeda running "in front of the hood of the vehicle." Flutsch then heard between ten and fifteen shots. After the shooting, Appellant shouted, "You thought I wasn't going to kill you," and drove away.

4

Appellant described a much more aggressive altercation, as follows. Villeda asked Appellant why he was trying to "pick up his baby mama." Villeda was angry and stated he was "facing 25 years to life" and had "nothing to lose." According to Appellant, Villeda "lunged through my window," "hit me on my left side of my cheek[,] went straight for my neck," and "started choking my neck" with both hands. Villeda was "squeezing pretty hard," such that Appellant was "having a hard time breathing" and "getting really dizzy." Appellant struggled with Villeda during the choking and was able to push him back at times, and Flutsch started pulling Appellant's left arm out of the car window. Appellant also noticed a third person had approached his car, which led him to believe "it's three people and just me." Appellant testified that he "feared for my life as soon as [Villeda] was choking me" and believed Villeda was trying to kill him. Someone then tried to open the car door, and Appellant held onto the door to prevent it from opening. When the door slightly opened, Appellant put his legs out of the door, and someone slammed the door on his shins. Villeda began "coming around the door," and Appellant "reached in between the seat and center console" and "drew a weapon." Appellant "c[a]me out the door," cocked his gun, and, as Villeda was running in front of Appellant, "unloaded all the magazine toward his direction." Appellant was not trying to kill Villeda but was "trying to get everybody away from me" and used the level of force

5

"immediately necessary to protect" himself.  Appellant denied saying anything after the shooting.

Soundless surveillance video from Los Corrales was admitted at trial.  The video does not show the altercation at Appellant's car or Appellant firing the gun because these happened outside the camera's frame; the bottom part of the front bumper of Appellant's car is visible in the video and, at times, the shoes of people standing near his car can be seen.  The video shows: Appellant pull into a parking spot across from the Los Corrales entrance at 1:36 p.m.; Flutsch walk to the car at 1:45 p.m.; Flutsch go back inside the club at 1:48 p.m. and then go back to the car at 1:50 p.m.; Villeda exit Los Corrales shortly thereafter and speak with someone in a car parked directly in front of the club; Flutsch get Villeda and bring him to Appellant's car at 1:51 p.m.; a man in a pink shirt exit the club at 1:53 p.m. and, after apparently watching what was occurring at Appellant's car for a little over one minute, walk to the car; around twenty-five seconds later, the pink-shirt man's feet can be seen backing away toward the front of the car, and then suddenly he and Flutsch run away, with Villeda quickly following them from what appears to be the passenger side of Appellant's car; Villeda run across the parking lot and collapse near the curb in front of Los Corrales; and Appellant immediately drive away after the shooting.

6

The detective who investigated Villeda's murder testified that he found no evidence that Villeda, Flutsch, or the third man were armed. Police found "nine or ten" 9-millimeter bullet casings at the scene.

A medical examiner testified Villeda died of multiple gunshot wounds, with one bullet entering the back of his head, a second the lower left side of his back, a third his right hip, and a fourth the back of his left thigh.

## C. Events following the shooting

The day after the shooting, Appellant took a bus to Bush Intercontinental Airport. A police officer working at the airport received a call to perform a welfare check on a man at an airport bus stop and encountered Appellant. The officer spoke with Appellant, who said his mother was not answering him and mentioned something about his "handler." The officer did not see any signs of injury on Appellant and recovered from him a passport, a knife, and 9-millimeter ammunition. Because of his behavior and statements, police obtained an emergency detention order to have Appellant transported to the hospital for evaluation.

The officer wore a body camera during the interaction, and this video was admitted into evidence with some redactions to the audio. Appellant's behavior throughout the video is unusual; he rants about his mother (including that his mother took away his "legal pistol" because he might kill himself); says he is angry and does not need medication; states "I need to get the fuck out of dodge man," "you have no

7

idea. I'm gonna make so much frickin noise. I've been making noise for the past couple days" and "this past week haven't had no patience with anybody. That's why I just do what I want to do, go where I want to go"; and, a few times, becomes upset and hyperventilates. The video shows Appellant point out an injury to his right eye and say, "wrong place, wrong time," to which an officer replies that it looks like a recent injury. The video also provides a clear view of Appellant's throat and neck, and no injuries are observable.

## D.     Relevant trial court proceedings

To support his self-defense theory, Appellant sought to introduce evidence that Villeda had two prior cases of assault against a family member, one of which he was on probation for at the time of his death, as well as evidence that Villeda was a gang member. The trial court excluded this evidence but allowed Appellant to question the detective about it outside the presence of the jury. The detective testified Villeda was a member of the "Southeast Crips" but did not offer any details of the Southeast Crips' activities or reputation. The detective likewise testified that Villeda had two assault-against-a-family-member cases but did not offer any details.

The jury rejected Appellant's claim of self-defense, found him guilty of Villeda's murder, and assessed punishment of fifty-five years in prison plus a ten-thousand-dollar fine. This appeal followed.

**Analysis**

In a single issue, Appellant argues the trial court abused its discretion by excluding evidence of Villeda's prior family-assault cases and gang membership.

**A.    Standard of review**

We review a trial court's decision to exclude evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *State v. Nunez*, 704 S.W.3d 598, 617 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) (mem. op.).  A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules and principles. *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020) (citing *Rhomer*, 569 S.W.3d at 669).  We will uphold an evidentiary ruling unless it falls outside the "zone of reasonable disagreement." *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018).  In addition, we will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

**B.    Self-defense and evidence of a victim's character generally**

A person commits murder if he "intentionally or knowingly causes the death of an individual" or "intends to cause seriously bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1)–(2).  But the use of deadly force in self-defense may be justified

in certain circumstances.  For example, "A person is justified in using deadly force against another . . . when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or (b) to prevent the other's imminent commission of . . . murder[.]"  *Id*. § 9.32(a)(2).

Appellant offered the excluded evidence to support his theory that Villeda was using unlawful deadly force against him and trying to kill him.  Appellant contends the evidence would have helped show Villeda's violent character and that his motive and intent was to choke Appellant to death.

In general, evidence of a person's character may not be used to prove the person "behaved in a particular way at a given time." *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998); *see also* TEX. R. EVID. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.").  This limitation on the use of character evidence is not absolute.  In a criminal case, subject to certain exceptions not relevant here, "a defendant may offer evidence of a victim's pertinent trait."  TEX. R. EVID. 404(a)(3)(A).  Under this rule, "[a] defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim

was, in fact, the first aggressor." *Ex parte Miller*, 330 S.W.3d 610, 619 (Tex. Crim. App. 2009);[1] *see also Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

A defendant may also introduce evidence of a victim's crime, wrong, or other act for purposes other than showing character conformity. TEX. R. EVID. 404(b)(2) ("This evidence [of a crime, wrong, or other act] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); *Ex parte Miller*, 330 S.W.3d at 620 ("prior specific acts of violence" may be offered under Rule 404(b)(2) for "a non-character purpose—such as his specific intent, motive for an attack on the defendant, or hostility—in the particular case"). "As long as the proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner other than demonstrating character conformity only, prior specific acts of violence may be admitted even though those acts were not directed against the defendant." *Torres*, 71 S.W.3d at 762.

---

[1]     *Ex Parte Miller* involved a prior version of Rule 404, which was restyled in 2015 without substantive change. *See* Final Approval of Amendments to the Texas Rules of Evidence, Misc. Dkt. No. 15-9048 (Tex. Mar. 10, 2015).

## C. Appellant's excluded evidence

### 1. Evidence of Villeda's prior cases of assault against a family member

Appellant first contends evidence of Villeda's prior cases of assault against a family member and his probation were admissible under Rule 404(b)(2) because they show Villeda's intent or motive.[2] The only information Appellant provided about Villeda's prior assault cases was that one occurred in 2011 and the other, for which Villeda remained on probation at the time of the shooting, occurred in 2021. Appellant did not present information about who the assaults were against or how they were carried out, such as whether they involved choking.

Thus, nothing in the record shows how these generic assault cases on an unknown family member[3] would establish Villeda's intent or motive to attempt to choke Appellant to death. *See Torres*, 71 S.W.3d at 761–62 (explaining victim's specific acts of violence admissible under Rule 404(b) if the "proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing,

---

[2] To the extent Appellant also argues the assaults and probation were admissible under Rule 404(a)(3) to show evidence of Villeda's "pertinent trait" and that he was the "first aggressor," we disagree. Appellant was required to present such character evidence through reputation and opinion testimony under Rule 405(a), not specific acts of violence. *See Ex parte Miller*, 330 S.W.3d at 619 ("[T]he defendant may *not* offer evidence of the victim's prior specific acts of violence to prove the victim's violent character and hence that the victim acted in conformity with that character trait at the time of the assault." (emphasis in original)).

[3] Appellant claims on appeal that the family member Villeda assaulted was Vega, but there is no evidence establishing this.

and in a manner other than demonstrating character conformity only"); *Allen v. State*, 473 S.W.3d 426, 446 (Tex. App.—Houston [14th Dist.] 2015, pet. dism'd) (in murder case in which defendant claimed self-defense, affirming exclusion of evidence of victim's prior assaults against girlfriend because defendant "has not explained how the proffered evidence of [victim's] physical abuse of [his girlfriend] . . . explain [his] aggressive conduct, and in a manner other than one that only demonstrates character conformity.").[4] We hold the trial court did not abuse its discretion in excluding this evidence.

## 2. Evidence of Villeda's gang membership

Appellant also argues evidence of Villeda's gang membership should have been admitted under Rule 404(a)(3).

The only information about Villeda's gang membership was that he was a member of the Southeast Crips. Appellant did not offer evidence that the Southeast Crips were known for violence. Gang membership, by itself, is insufficient to show a person's character for violence. *See Anderson v. State*, 901 S.W.2d 946, 950 (Tex. Crim. App. 1995) (en banc) (in appeal involving evidence of gang membership admitted during punishment phase to show defendant's character, explaining

---

[4] Appellant also argues the fact the Villeda was on probation for assault should have been admitted to "contextualize" his comment that he was "facing 25 years to life" and had "nothing to lose." But there is no evidence Villeda was on probation for a family-violence offense that had him "facing 25 years to life," so this evidence would not have provided the asserted context.

evidence of "gang membership alone would be meaningless to a jury which has no knowledge of the gang's purpose or activities"). Thus, this evidence did not pertain to Villeda's "pertinent trait" for violence or support that he had a reputation for violence or aggression. *See Ex parte Miller*, 330 S.W.3d at 619. We hold the trial court did not abuse its discretion in excluding this evidence.

We overrule Appellant's sole point of error.[5]

## Conclusion

We affirm the trial court's judgment.

Andrew Johnson
Justice

Panel consists of Justices Guerra, Guiney, and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[5] Even assuming the trial court had erred in excluding evidence of Villeda's family-assault cases, probation, and gang membership, we would conclude the error did not affect Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). Appellant was not precluded from presenting a self-defense theory. He did so through testimony that Villeda was angry at Appellant for communicating with Villeda's wife, stated he was "facing 25 years to life" and had "nothing to lose," and violently choked Appellant. Vega also testified Villeda loved to fight. But significant evidence weighed against self-defense. Flutsch testified that Villeda was not trying to choke Appellant and that, after the shooting, Appellant shouted, "You thought I wasn't going to kill you." The autopsy evidence supports that Appellant shot Villeda in the back as he was running away, Appellant testified he "unloaded all the magazine toward [Villeda's] direction . . . as [he] is running in front of me," and the surveillance video shows Villeda running away from Appellant's car before collapsing. Police video of Appellant the following day shows he did not have any injuries to his throat or neck that would have corroborated that Villeda violently choked him.

14