**Opinion issued December 9, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-23-00945-CR

————————————

**RAY IRVIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Court at Law No. 2**
**Brazoria County, Texas**
**Trial Court Case No. 253516**

---

## MEMORANDUM OPINION

A jury found Ray Irvin guilty of the offense of assault causing bodily injury[1]

and found that the complainant, Sequella Kegler, was a member of his household.

The jury assessed Irvin's punishment at confinement for one year with a $4,000 fine.

---

[1]   *See* TEX. PENAL CODE § 22.01(a)(1); *see also* TEX. CODE CRIM. PROC. art. 42.013.

The trial court suspended his confinement for one year of community supervision and entered an affirmative finding of family violence.

On appeal, Irvin contends that the trial court erred in allowing a witness to testify as an expert on domestic violence and erred in failing to sua sponte include an instruction on extraneous offenses in the guilt-stage jury charge.

We affirm.

## Background

Kegler began a dating relationship with Irvin, and he eventually moved into her apartment. Over time, Irvin became aggressive towards Kegler. When Irvin's aggressive behavior escalated, Kegler asked him to leave. Irvin called his ex-girlfriend, Kim Toney, and asked if he could stay with her. She refused. Irvin then got angry with Kegler and yelled at her. Kegler feared for her safety. When she saw an "opportunity to leave," she ran out of the apartment in her pajamas and socks. Irvin ran after her.

Outside the apartment, Kegler slipped and fell on the ground. According to Kegler, Irvin grabbed her hair and "pull[ed] [her] back into the apartment." He pulled out sections of Kegler's hair and left her with "several bald spots." The trial court admitted photographs of Kegler's scalp into evidence. Irvin did not release Kegler until they were back inside the apartment and he had shut the door. There, Irvin yelled at Kegler and demanded to know why she had tried to leave.

Kegler testified that, a short while later, police officers knocked on the door. Irvin, who was a police officer at the time, instructed Kegler to stay quiet and not to answer the door. After the knocking stopped and Irvin thought the officers had left, he let Kegler take her dog outside.

Once outside, Kegler saw officers approaching her from several directions. Kegler admitted that, initially, she was not "cooperative" with the officers and did not tell them what had occurred. She explained at trial that she feared Irvin, as a police officer, would get access to anything she reported and that the officers would be unable to "protect" her from him. She also felt embarrassed because she dealt with domestic-violence victims in her profession and felt she should not have allowed herself to get into such a situation.

Pearland Police Department Officer H. Oubre testified that he was dispatched to the apartment complex to investigate a report of an assault in progress. When he arrived, officers were trying to gain entry into one of the apartments. A witness had reported that "someone had been drug back into" the apartment. Officer Oubre found jewelry on the ground nearby—"like someone had fallen there and dropped some things." Kegler later identified the jewelry as her own. Officer Oubre also found socks on the ground, which he noted was consistent with being dragged.

Houston Police Department, Internal Affairs Division, Sergeant K. Bartels testified that she interviewed Kegler at the apartment. Sergeant Bartels told Kegler

that a witness had reported seeing Irvin grab her hair and drag her inside the apartment. Kegler denied the allegation.

Toney also testified Kegler had denied the allegation to her later that night. Toney admitted that she (Toney) was in a dating relationship with Irvin at the time of trial.

The State presented Claudette Tuggle, the executive director of the Women's Center in Brazoria County, as an expert witness on the dynamics of domestic violence. Tuggle testified that her work at the facility involves residential and nonresidential services for victims of domestic violence. She noted that her facility receives up to 80 calls a day for assistance. Tuggle has a master's degree in education and has training on the dynamics of domestic violence—including the "cycle of violence"—from the Texas Council on Domestic Violence and a Houston area women's shelter. And she holds classes for clients and staff about this cycle.

Tuggle further testified that, in her previous role as a school administrator for six years, she gained training and experience in assisting students and families who were dealing with dating violence.

Tuggle explained that the "cycle of violence has four different phases." Phase one, the "tension-building phase," is characterized by escalating arguments. Phase two, the "incident," is when the actor commits "a physical attack" or "some other sort of abuse." Phase three is the "honeymoon phase," during which the actor

4

apologizes and promises reform. Phase four is "the calm," when everything returns to normal. She described each phase in detail and opined that the cycle is "going to happen again typically."

Tuggle stated that shifts in power and control during the tension phase—such as asking the actor to leave the house—can be a catalyst for an incident. And she noted that victims of domestic violence often do not report incidents out of fear or embarrassment. Tuggle clarified that she was not there to opine about this specific case.

At the close of the guilt phase, Irvin did not submit a proposed jury charge or request an instruction on extraneous offenses. Rather, he stated that he had no objections to the charge. The jury found Irvin guilty of assault causing bodily injury and answered in a special issue that he was in a dating relationship with Kegler and that she was a member of his household.

Tuggle testified again during the punishment phase. She connected the cycle of violence to the dynamics of Irvin's relationship with Kegler. And she opined that Kegler was afraid of Irvin. Irvin was assessed punishment of confinement for one year and a fine, with confinement suspended for one year of community supervision.

**Expert Testimony**

Irvin contends that the trial court abused its discretion by allowing the State to present Tuggle's testimony. He asserts that the State failed to establish that Tuggle was qualified as an expert on domestic violence and that the trial court erred in allowing her to testify "about her observations of" Irvin and Kegler.

### A.    *Standard of Review and Legal Principles*

Texas courts have "routinely" allowed expert testimony on the cycle of domestic violence and its dynamics to help juries understand a victim's delay, reluctance, and inconsistencies in reporting. *Foster v. State*, No. 01-17-00537-CR, 2018 WL 1914871, at *5 (Tex. App.—Houston [1st Dist.] Apr. 24, 2018, pet. ref'd) (mem. op., not designated for publication) (listing cases). We review a trial court's decision to admit expert testimony for an abuse of discretion. *Blasdell v. State*, 470 S.W.3d 59, 62 (Tex. Crim. App. 2015). We will uphold the trial court's decision unless it falls outside the zone of reasonable disagreement. *Id.*

The Texas Rules of Evidence set out three conditions for expert testimony to be admissible. *Vela v. State*, 209 S.W.3d 128, 130 (Tex. Crim. App. 2006). First, the trial court must determine that the witness is qualified. *Id.* at 130–31; *see* TEX. R. EVID. 104(a). Second, the testimony must be reliable. *Vela*, 209 S.W.3d at 131. A witness qualified as an expert "may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier

of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702; *see Vela*, 209 S.W.3d at 131. And third, the testimony must be relevant. *Vela*, 209 S.W.3d at 131. Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." TEX. R. EVID. 401; *see also id*. 402.

Only the first condition is at issue in this case: Irvin contends that Tuggle is not qualified to testify as an expert on domestic violence.

A trial court has "great discretion in determining whether a witness possesses sufficient qualifications" as an expert on a specific topic in a particular case because the "possible spectrum of education, skill, and training is so wide." *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006) ("If the witness has some special knowledge or additional insight into the field that would be helpful, then the expert can assist the trier of fact to understand the evidence or to determine a fact in issue."). A trial court's ruling on a witness's qualifications "will rarely be disturbed on appeal." *Buford v. State*, 606 S.W.3d 363, 372 (Tex. App.—Houston [1st Dist.] 2020, no pet.). "The special knowledge [that] qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things." *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (internal quotations omitted). There is no

requirement that the expert's knowledge, training, or experience be based on scientific principles. *Rhomer v. State*, 569 S.W.3d 664, 670 (Tex. Crim. App. 2019).

To determine whether a trial court has abused its discretion in ruling on an expert's qualifications, *Rhomer* instructs that we weigh three factors: "(1) Is the field of expertise complex? (2) How conclusive is the expert's opinion? (3) How central is the area of expertise to the resolution of the lawsuit?" *Id*. at 669–70. "Greater qualifications are required for more complex fields of expertise and for more conclusive and dispositive opinions." *Id*. at 670.

## B.    *Discussion*

Here, the trial court conducted a hearing outside the jury's presence to determine whether to admit Tuggle's testimony. At the hearing, Irvin objected that Tuggle was not qualified as an expert on domestic violence. He complained that she "just doesn't have the experience to opine on domestic violence or even discuss the cycle of violence." After the hearing, the trial court concluded that it would allow Tuggle to testify to "help the jury understand the dynamics, speaking generally, in domestic violence."

Irvin argues that the admission of Tuggle's testimony was erroneous because she has "no training or licenses that pertained to domestic violence"; "received no written training or schooling on the issue of domestic violence"; had never previously testified as an expert on domestic violence; and had never written on the

8

topic. Irvin also complains that Tuggle was "allowed to testify about an unknown person who recanted at the Women's Shelter" and was allowed to opine "on how common it is for persons to change their stories" when reporting domestic violence. Irvin complains that he was harmed by this testimony because it "insinuated that [Tuggle] knew about prior extraneous acts of violence between [Irvin] and [Kegler]" and that it bolstered Kegler's testimony.

The State responds that the trial court's conclusion—that Tuggle possessed the necessary education, training, and experience to qualify as an expert—must be upheld because it lies within the zone of reasonable disagreement.

Tuggle explained at the hearing that she has a master's degree in education and received training on the dynamics of domestic violence from the Texas Council on Domestic Violence and a Houston area women's shelter. Her training included the "cycle of violence." And she teaches clients and staff at her facility about this cycle. In her previous role as a school administrator for six years, Tuggle underwent annual training and gained experience in assisting students and families dealing with dating violence. And in her role as the executive director of the Women's Center in Brazoria County, she works with victims of domestic violence on a daily basis.

In *Dixon v. State*, 244 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd), the appellant argued that a police officer was not qualified to testify as an expert on the behavior of victims of family violence because he lacked formal

training. The officer testified that he had received training from the police department pertaining to family violence and that his years of experience as an officer and member of the family violence unit involved visiting scenes in which family violence had occurred and dealing with victims. *Id.* Through his experience, he had observed common trends among victims of family violence. *Id.* The court of appeals held that the trial court did not abuse its discretion in concluding that the officer was qualified, based on knowledge, training, and experience, to testify as an expert regarding the behavior of victims of family violence. *Id.*

Similarly here, the trial court could have reasonably concluded that Tuggle was qualified to discuss, at least in general, the dynamics of domestic violence and why a victim might be hesitant to report violence from a member of her household. Tuggle's background went to the very matter upon which she testified. *See Rhomer*, 569 S.W.3d at 670. "[T]here is no litmus test, no particular license or degree that an expert must possess to qualify." *Brown v. State*, No. 02-19-00238-CR, 2020 WL 6929846, at *3 (Tex. App.—Fort Worth Nov. 25, 2020, no pet.) (mem. op., not designated for publication).

Further, as Irvin notes in his brief, the "vast majority" of Tuggle's testimony consisted of explaining the four phases of domestic violence. The discussion presented was not complex or highly technical in nature. *See Rhomer*, 569 S.W.3d at 670. And Tuggle's testimony was not conclusive—rather, she spoke in terms of

10

what "typically" happens, hypotheticals, and generalities or average situations. *See id.* However, Tuggle's expertise on the cycle of violence and fear of reporting was central to the resolution of this case—which depended on Kegler's credibility. *See id.* Thus, two of the three *Rhomer* factors weigh in favor of upholding the trial court's ruling. *See id.*

Accordingly, we hold that the trial court did not abuse its discretion in concluding that Tuggle was qualified to offer an expert opinion on the dynamics of domestic violence. *See Rhomer*, 569 S.W.3d at 670 ("Given that two of the three . . . factors weigh in favor of upholding the trial court's ruling on [the witness's] qualifications, we cannot say the trial court abused its discretion in admitting [his] opinions."); *see also Blasdell*, 470 S.W.3d at 62 (we uphold trial court's decision unless it lies outside zone of reasonable disagreement).

We overrule Irvin's first issue.

## Charge Error

Irvin next contends that the trial court reversibly erred in failing to sua sponte include an instruction on extraneous offenses in the jury charge at the guilt stage. He admits that he did not object to the jury charge at trial. Relying on *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984), he argues that this error "rose to the level of egregious harm."

11

## A. *Standard of Review and Legal Principles*

Texas Code of Criminal Procedure article 36.14 imposes a duty on trial courts to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. art. 36.14. The charge should include "all of the law applicable to the criminal offense that is set out in the indictment," as well as general admonishments. *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (internal quotations omitted). "These matters are always 'law applicable to the case.'" *Id*. And a trial court is required to instruct on these issues "sua sponte, even without prompting from counsel," because the trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions." *Id*.

Thus, alleged jury-charge error *with respect to the law applicable to the case* "must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *see Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000).[2]

---

[2] "[I]f a defendant complains on appeal about an erroneous instruction (or lack of a proper instruction) regarding an area of the law that is considered the law applicable to the case," the *Almanza* framework applies. *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021) (discussing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). Under that framework, "[e]rror preservation does not become an issue until harm is assessed because the degree of harm necessary for reversal depends upon whether the error was preserved." *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003); *see Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (whether defendant objected to error simply determines which of *Almanza*'s dual standards of review applies to determine whether error is reversible).

However, "it does not inevitably follow that [the trial court] has a similar sua sponte duty to instruct the jury on all potential defensive issues, lesser-included offenses, or evidentiary issues." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). Because requests for such instructions frequently depend upon trial strategy and tactics, they are not considered "law applicable to the case." *See id*. at 249–50; *see also Williams v. State*, 662 S.W.3d 452, 461 (Tex. Crim. App. 2021). And a trial court is not obligated to instruct the jury on them absent a proper request. *Delgado*, 235 S.W.3d at 249–51; *see also Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) (absent proper request, defendant "cannot complain on appeal about the trial [court's] failure to include a defensive instruction").[3]

"Texas courts have frequently stated that the decision of whether to request a limiting instruction concerning the proper use of certain evidence, including extraneous offenses, may be a matter of trial strategy." *Delgado*, 235 S.W.3d at 250. If a defendant does not request a limiting instruction at the time extraneous offense evidence is admitted during the guilt stage, the trial court has no obligation to limit the use of that evidence later in the guilt-stage jury charge. *Id.* at 251.

---

[3] Notably, when "the complained-of error is the lack of a defensive instruction, the *Almanza* framework does not apply." *Williams*, 662 S.W.3d at 461; *Zamora v. State*, 411 S.W.3d 504, 513 (Tex. Crim. App. 2013) ("*Almanza . . .* does not apply to defensive issues.").

Further, the Court of Criminal Appeals has expressly held that "a trial court is not required to instruct the jury sua sponte on the burden of proof to be used when considering evidence of an extraneous offense during the guilt phase." *Id*. at 254 ("Because the trial judge had no duty to give any limiting instruction concerning the use of an extraneous offense in the guilt-phase jury charge, it naturally follows that he had no duty to instruct the jury on the burden of proof concerning an extraneous offense.").[4]

**B.**    *Discussion*

According to Irvin, "there were references to extraneous offenses in the record which triggered the necessity of a corresponding instruction."  And "the jury could have considered whether the [S]tate proved the extraneous offense of Unlawful Restraint by means of [Irvin's] initial refusal to let [Kegler] answer the door when the police knocked, or when she attempted to flee the apartment thereafter on foot and ultimately fell down and was drug back into the apartment by her hair."[5]

---

[4]    "The rule is somewhat different during the punishment phase of a non-capital case because a specific statutory provision applies to the use of extraneous offense evidence at that time." *Delgado v. State*, 235 S.W.3d 244, 252 (Tex. Crim. App. 2007); *see* TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1) (extraneous offense evidence is admissible for any relevant purpose during punishment, but only on proof that would allow reasonable fact-finder to conclude beyond reasonable doubt that defendant could be held criminally responsible for that act).

[5]    We note that, according to the record, the police arrived to investigate *after* Kegler's attempt to flee the apartment and the assault.

Irvin also points to testimony by the arresting officer that Irvin was initially "going to be charged" with the offense of "assault by contact," a Class C misdemeanor, and that the charge was later changed to the offense of unlawful restraint—based on Irvin directing Kegler not to answer the door when police arrived and Kegler's attempt to flee the apartment. But, ultimately, the State abandoned the charge of unlawful restraint. And Irvin was tried and convicted only of family-violence assault causing bodily injury, a Class A misdemeanor.

The record before us shows that Irvin did not object to any of the testimony that he now complains about on appeal, he did not ask for any instructions about this evidence at the time it was offered or at the charge conference, and he did not submit a proposed charge. Further, Irvin admits that he did not object to the jury charge as given.

The State argues that the complained-of testimony constitutes same-transaction contextual evidence of the family-violence assault and that a party is not entitled to a reasonable-doubt instruction with respect to such contextual evidence.

Irvin responds that, while reference to the facts underlying the initial unlawful restraint charge "may be somewhat contextual in that it occurred at some point after the incident made [the] basis of this suit, it requires proof of an entirely different set of elements than that of assault." And "[a]ssuming that reference to the restraint was relevant as character evidence under [Texas Rule of Evidence] 404(b), it can only

be considered by a jury if the elements of that offense are proven beyond a reasonable doubt."[6]

Under Texas law, "[e]vidence of another crime, wrong, or act . . . may be admissible as same-transaction contextual evidence where 'several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony . . . of any one of them cannot be given without showing the others.'" *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (quoting *Wyatt*, 23 S.W.3d at 25). "[S]ame-transaction contextual evidence is admissible only when the [charged] offense would make little or no sense without also bringing in [the same-transaction contextual] evidence." *Id.*

The purpose of admitting same-transaction contextual evidence is to put the charged offense in context. *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993). "[E]vents do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of [the charged offense] so that it may realistically evaluate the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). When such evidence is admitted,

---

[6] Texas Rule of Civil Procedure 404(b) provides: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b).

Rule 404(b) is not implicated and the defendant is not entitled to any instruction on the use of that evidence. *Delgado*, 235 S.W.3d at 253–54.

Here, Kegler's testimony about her fleeing the apartment, Irvin dragging her back into the apartment, and Irvin's subsequent refusal to let Kegler open the door to investigating officers was part of an "indivisible criminal transaction." *See Devoe*, 354 S.W.3d at 469. This evidence put the charged offense in context, demonstrated to the jury the control that Irvin exerted over Kegler, and was necessary to explain why Kegler was initially not truthful with the police. The trial court could have reasonably concluded that this testimony constituted same-transaction contextual evidence. *See Delgado*, 235 S.W.3d at 253–54. Therefore, Irvin was not entitled to any instruction on the use of that evidence. *See id*.

Additionally, absent a proper request to the trial court, Irvin cannot complain on appeal that the trial court failed to include an instruction at the guilt phase concerning the State's burden of proof for extraneous offenses. *See id*. Thus, the trial court had no duty to sua sponte include such instruction in its guilt-phase charge. *Id.* at 254.

We overrule Irvin's second issue.

## Conclusion

For all of the reasons above, we affirm the trial court's judgment in all things.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Morgan and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).